**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**AMBOX, INCORPORATED, Respondent.**

**No. 21989.**

United States Court of Appeals
Fifth Circuit.

March 1, 1966.

Marcel Mallet-Prevost, Asst. Gen. Counsel, Morton Namrow, Atty., N. L. R. B., Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Glen M. Bendixsen, Atty., N. L. R. B., Washington, D. C., for petitioner.

Charles R. Vickery, Jr., Huggins, Vickery & McConnell, Houston, Tex., for respondent.

Before JONES and BROWN, Circuit Judges, and DYER, District Judge.

DYER, District Judge:

The Board seeks enforcement of its order issued on May 12, 1964, against the respondent who is engaged in the custom fabrication of metal products.

The Board found that respondent violated Section 8(a) (1) of the Act by coercively interrogating employees and indicating that their union activities had been under surveillance, by urging that the formation of a company union would result in increased benefits, by announcing a wage increase and certain employee benefits at a time when the union's election objections were pending before the Board, and by importuning employees to furnish or exhibit statements given to Board agents.[1]

The Board further found that respondent violated Section 8(a) (2) and (1) of the Act by promoting and establishing a company dominated union known as the "Employees-Management Relations Council." [2]

---

1. The Board did not adopt the Trial Examiner's recommended finding that the grant of benefits and the interrogation of employees by respondent's counsel were not violations of Section 8(a) (1) of the Act.

2. The 8(a) (2) case is not contested by respondent.

The Board also found that respondent violated Section 8(a) (3) and (1) of the Act by discharging employees Sydow and Zella on December 7, 1962, and Deasy and Spears on December 14, 1962, because of their union activities.

The facts are, for the most part, not in dispute. On December 3, 1962, employees Sydow, Zella, Deasy and Spears discussed the prospects for getting union representatives at the respondent's plant. They arranged to meet with a representative of the union that night at Deasy's motel room. They signed union authorization cards and Sydow and Zella were given additional cards to distribute to employees at the plant.

By December 6, 1962, Sydow and Zella had succeeded in signing up seventeen of the company's thirty-four employees.

On December 7, 1962, Sydow, Zella and one other employee were terminated "because of lack of work."

The union wrote respondent on December 11, 1962, claiming that a majority of the employees had selected it as their bargaining representative. On December 12, 1962, the respondent's president denounced the union over the loudspeaker and expressed his disbelief in the claim that the union represented a majority.

At a company Christmas party on December 13, 1962, the president expanded his views why he thought the employees should not be represented by the union and posted his own letter next to the union's letter on the bulletin board.

The Board credited testimony concerning certain conversations on December 13 and 14 between the foreman and production manager and employee Deasy. On December 13, about quitting time, as Deasy was clocking out, foreman McCullars asked him if he had heard that the "boys (were) trying to get a union here" and asked if he would give him some information about it. Deasy avoided answering, telling McCullars, "You know as much about it as I do. It's posted on the bulletin board."

The following day, December 14, 1962, production manager Dicks asks Deasy to disclose what he knew about "this union stuff going around the shop." Deasy spoke in favor of it, but said he understood the president was "pretty well shook up about it." Dicks replied, "You can't very well blame him," referring to increased labor costs. Later in the day Dicks discharged Deasy, Spears[3] and two additional employees for "lack of work."

Shortly before the Board election in April, 1963, the president told the employees that they would be better off with a company union. The union lost the election and subsequently filed objections. The following week the president commended the employees for having defeated the union, announced a wage increase, and said that if anyone wanted a change of jobs or shifts to talk to him about it. Thereafter, an "Employees-Management Relations Council" (company dominated union) was formed, the details and operation of which are now unimportant since the 8(a) (2) violation finding is not contested by the respondent.

About a week before the start of a Board hearing on September 17, 1963 (on unfair labor practice charges filed by the union and consolidated with the objections to the Board election proceeding), respondent asked some employees to go to the office of its attorney for interviews. The attorney questioned the employees as to who the leaders were of the organizational efforts, and when he was confronted with their reluctance to make any disclosures, he stated that he knew that Zella, Sydow and Deasy were the ringleaders. During the interview, the attorney also asked the employees if they had furnished statements to the Board's agents. One who had was requested by the attorney to let him see a copy of it, and later respondent's president told him that if he would give him a copy of it, "it would put a feather in (his) cap."

---

3. Spears was rehired for his old position on January 30, 1963.

Alleged 8(a) (1) Violations

█ *The Deasy Conversations.* Even in the light of the total circumstances presented here, the two isolated questions put to Deasy on December 13 and 14 did not carry a threat to retaliate against or interfere with union sympathizers, N. L. R. B. v. McGahey, 5 Cir. 1956, 233 F.2d 406, nor could proscribed coerciveness be inferred. The interrogations were not accompanied by any overt threat or promise, and were not such as would tend to influence the employees and interfere with the free exercise of their organizational rights under the Act. N. L. R. B. v. Fontainebleau Hotel Corporation, 5 Cir. 1962, 300 F.2d 662. As we recently said in N. L. R. B. v. Affiliated Food Stores, Inc., 5 Cir. 1965, 353 F.2d 287:

"The evidence falls far short of that in N. L. R. B. v. Harbison-Fisher Manufacturing Co., (5 Cir. 1962) 304 F.2d 738, and that case, we think, represents the outer limits of the application of interference as it is proscribed in Section 8(a) (1) of the Act. The circumstances of the questioning tended toward coercion there but not here."

█ *Respondent's grant of benefits while objections to election were pending.* The trial examiner found this did not violate Section 8(a) (1) of the Act, but the Board sustained exceptions to this finding because in its view it was calculated to influence the employees' choice of a bargaining representative in the event of a second election, and encouraged membership in a company dominated union. We think the trial examiner was right. We are not persuaded by the Board's inverse analogy drawn from N. L. R. B. v. Exchange Parts Co., 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435, where there was a grant of benefits before, and not as here, after an election. It was made clear that the increases would be granted retroactively as soon as the election objections were cleared up, and the promise of benefits was not made dependent on the outcome of the election proceeding. To extend the pre-election prohibition to the post-election period, under the circumstances here existing, would unnecessarily seriously curtail the rights of employers and employees.

*Interrogation of employees by respondent's counsel prior to hearing.* The trial examiner found that "in the absence of evidence that the Company had knowledge of the matters inquired about in the instant case" respondent did not violate Section 8(a) (1) of the Act by its counsel's interrogation of employees approximately a week before the hearing on unfair labor practice charges. The Board overturned this finding.

██ There is no doubt that where an employer has a legitimate cause to inquire, he may exercise the privilege of interrogating employees on matters involving their Section 7 rights without incurring Section 8(a) (1) liability. Did the interrogation here go beyond that legitimately necessary for the preparation of respondent's defense? We think not. The inquiry did not delve into union matters *beyond* the limits of the issues raised by the complaint.

██ During counsel's interrogation of the employees (in September, 1963), he asked them whether or not Zella, Sydow and Deasy were the leaders of the organizational efforts. The Board found that this indicated to the employees that their union activities had been under surveillance in December, 1962. This cannot be sustained. Knowledge of the identity of union leaders is no substantial evidence of surveillance of their activity for it may be acquired in an infinite variety of lawful ways. Indeed, this knowledge was revealed nine months after the fact to which the Board relates it.

█ Counsel's request, however, of two Board witnesses for copies of their Board statements, and the employer's solicitation from an employee of a copy of his statement with the promise it would put a feather in his cap violated the Act. N. L. R. B. v. Lyon, Incorporated, 5 Cir. 1965, 341 F.2d 301; Texas

Industries, Inc. v. N. L. R. B., 5 Cir. 1964, 336 F.2d 128.

■ *Benefits promised by respondent's president.* Before the Board election, the president urged the employees to forego the union and organize a company union. He promised that they would get more out of him if they should do so. This clearly violated the Act.

### Alleged 8(a) (3) Violations

The Board found that respondent discharged employees Zella, Sydow, Spears and Deasy because of their union activities. The respondent contests this finding because (1) even though a sufficient business decline to warrant the layoffs was admitted, the petitioner, nevertheless, found the decline was not the real motive, but only a pretext; and (2) the respondent had no knowledge of union activities.

The business of respondent showed a marked decline for the month of December, 1962, and thereafter. Nevertheless, only four days before Sydow and Zella were discharged, the production manager informed the employees that it looked like the work was picking up. Shortly before Deasy and Spears were laid off, the production manager told Deasy that he had checked the advance production schedules and there wouldn't be any more layoffs because there was enough work for all of the people then employed.

■ The Board was entitled to also consider the fact that the four employees who initially met with the union were selected for discharge, while only three of the other twenty-nine employees were chosen. There was a permissible inference from this of discrimination based on the percentage of discharged employees involved in union activities, which was of sufficient probative value to be weighed in reaching its decision. N. L. R. B. v. Camco, Incorporated, 5 Cir. 1965, 340 F.2d 803.

Respondent's reason for choosing Spears and Sydow for termination was because they were junior employees, yet Zella was a senior employee. Furthermore, there was no consultation with the immediate supervisors of either Deasy or Zella as to recommendations concerning their layoff. Zella was a capable employee and had received a safety award in 1961 and would have been entitled to it in 1962 except for his termination, while others in his department who were retained never attained such recognition.

Although it was claimed that a significant portion of Deasy's layout work had to be rejected, he was never informed that he might be subject to discipline or layoff.

Oddly enough, Spears had been given a twenty-two cent increase effective December 12—two days before he was terminated, and had worked four hours overtime during the last full week of his employment.

■ Without detailing more, the specific reasons advanced by respondent to justify its selection of Zella, Sydow, Spears and Deasy for termination "failed to stand under scrutiny." N. L. R. B. v. Griggs Equipment, Inc., 5 Cir. 1962, 307 F.2d 275.

■ Although there is no direct proof that the employer knew of the union activity of the union leaders he discharged, the circumstantial evidence warrants the inference of illegal discharge for it is clear that respondent was unalterably opposed to unionization of its employees, had knowledge of organizational activities and engaged in unlawful conduct to forestall the union's selection. N. L. R. B. v. Link-Belt Co., 311 U.S. 584, 61 S.Ct. 358, 85 L.Ed. 368.

The only question is whether the Board's findings that the employees were discriminatorily discharged in violation of Section 8(a) (3) and (1) are supported by substantial evidence on the record considered as a whole.

"We cannot disturb the Board's choice if there is a fair conflict between the employer's testimony and a reasonable inference of discrimina-

tion. N. L. R. B. v. Florida Citrus Canners' Corp. [Co-op.], 5 Cir. 1963, 311 F.2d 541; N. L. R. B. v. Walton Mfg. Co., 5 Cir. 1963, 322 F.2d 187. The Board is not compelled to accept the employer's statement when there is reasonable cause for believing that the ground put forward by the employer was not the true one, and that the real reason was the employer's dissatisfaction with the employee's union activity. N. L. R. B. v. Texas Bolt Co., 5 Cir., 313 F.2d 761."

See also our recent decisions in The Great Atlantic and Pacific Tea Co., Inc. v. N. L. R. B., 5 Cir., 354 F.2d 707 and N. L. R. B. v. Mira-Pak, Inc., 5 Cir., 354 F.2d 525.

We conclude that the following findings of the Board are supported by substantial evidence on the record considered as a whole:

(a) Employees Zella, Spears, Sydow and Deasy were discriminatorily laid off or discharged for engaging in protected activities in violation of Section 8(a) (3) and (1).

(b) The company dominated "Employees-Management Relations Council" was a violation of Section 8(a) (2).

(c) Respondent's request for the Board statements of Spears and Sutherland was a violation of Section 8(a) (1).

(d) Respondent's promises of benefits to employees if they formed a company union was a violation of Section 8(a) (1).

The absence of substantial evidence to support the following claimed Section 8 (a) (1) violations requires that we deny enforcement as it relates to such conduct:

(a) Respondent's interrogation of Deasy, Spears and Sutherland.

(b) Respondent had unlawfully kept the union activities under surveillance.

(c) Respondent's granting of benefits after the union lost the election in April, 1963.

Enforced in part; Denied in part.