**MONROE, Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 71–1562.**

United States Court of Appeals, Fourth Circuit.

Argued Jan. 7, 1972.

Decided May 16, 1972.

M. J. Diederich, Torrance, Cal., for petitioner.

Peter G. Nash, General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Leonard M. Wagman and Harold J. Engel, Attorneys, N.L.R.B. for respondent.

Before BRYAN and RUSSELL, Circuit Judges, and YOUNG, District Judge.

JOSEPH H. YOUNG, District Judge.

This case comes before us upon a petition to review and set aside an order of the National Labor Relations Board issued against the employer, Monroe, on May 25, 1971, pursuant to § 8(a) (1) of the National Labor Relations Act.[1] In its cross-application for enforcement, the Board has requested that its order be enforced in full. The Board's Decision and Order are reported at 190 N.L.R.B. No. 100 (A. 73–86).

By its order the Board reversed the Trial Examiner's recommendation of dismissal of the charges, and found Monroe had violated a section of the Act by instituting wage and benefit changes during the pendency of the decertification petition and by the issuance of a letter by its President.

Monroe contends that the alleged violations are not supported by substantial evidence on the record as a whole, that it was justified in granting the wage and benefit increases, and that the Board's order should not be enforced.[2] We agree, and reverse the Board's order and deny its cross-application.

Monroe, a subsidiary of Litton Industries, maintains its principal office and plant in Orange, New Jersey and is engaged in the manufacture, sale and service of calculators, adding machines and related products. Local 432, International Union of Electrical, Radio and Machine Workers of America, AFL–CIO is the bargaining representative for the unit involved in this case.

Monroe and Automated Business Systems (ABS), a separate and distinct op-

1. 29 U.S.C.A. § 158(a) (1).

2. Monroe also asserts that the Trial Examiner and the Board erred in refusing to accept into evidence certain letters written by the union during the election campaign, a petition signed by a number of employees stating the election was fair, and a letter written by Doyle (the employee who had filed the petition for a decertification election) to his fellow employees during the election campaign. In view of the fact that we deny enforcement of the Board's order, we need not decide whether reversible error was committed by the Trial Examiner and the Board in refusing to admit the aforementioned material into evidence for such error, if any, is rendered harmless by our decision.

erating division of Litton Industries[3] located in Clifton, New Jersey, were, until February 18, 1969, signatories to a collective bargaining agreement with the union covering the production and maintenance employees at both facilities. On February 18, 1969, Monroe and the union signed an agreement providing that the production and maintenance employees at the Orange and Clifton facilities would constitute two distinct bargaining units. The Trial Examiner and the Board both found the unit at Orange, New Jersey to be an appropriate one for bargaining purposes. This finding has not been contested on appeal.

The Board, in overruling the conclusion of the Trial Examiner, held that the unilateral institution of wage and benefit increases by Monroe on October 13, 1969, affecting the unit employees at its Orange, New Jersey, facility, constituted an unfair labor practice in violation of § 8(a) (1) of the Act, charging that the increases were granted during the pendency of a decertification petition to influence the outcome of the upcoming but unscheduled election.

The Board considered significant the negotiations of January-February, 1969, when the union had requested an increase of $1 an hour for Monroe employees, but Monroe successfully negotiated this figure to an average increase of 10 cents an hour, despite the fact that Monroe was well aware that its pay scale for production and maintenance personnel was far below that of other employers in the area. The Trial Examiner was persuaded by Monroe's testimony that it had pursued such a course of action because it knew it would be facing new negotiations with the union and increased demands when the collective bargaining agreement expired in September of 1969. Indeed, following the execution of the agreement separating the bargaining unit, the union asked for renewed negotiations as soon as possible, though

the existing contract was not to expire until September 30, 1969.

The first negotiating session was held in June, 1969. According to the testimony of the union, a total of three sessions were held with each side presenting its initial contract proposals. However, a petition for a decertification election was filed with the Board by Monroe employee Thomas Doyle, on July 11, 1969, preventing negotiations from going beyond the preliminary stage. The employee also filed unfair labor practice charges with the Board against Monroe and the union respectively. On August 5, 1969, Monroe and the union officials met for the last time and agreed to terminate negotiations until the matters pending before the Board were resolved.

The Board relies upon the fact that Monroe's initial proposals in June of 1969 did not match the increases granted on October 13, 1969 to show that it instituted the wage and benefit increases to influence the outcome of the decertification election. This reliance is misplaced when the record reveals that in June, 1969, when the contract negotiations began, neither party was aware of the legal entanglements which followed Doyle's petition and charges. It would be unfair to attach improper motivation to conduct considered normal in labor negotiations.

The Board dismissed Doyle's charges on August 29, 1969, thereby "unblocking" the decertification process, but no significant progress was made in setting a date for the election. On September 25, 1969, Doyle filed yet another charge against the union once again blocking processing of the decertification petition.

The employee's most recent unfair labor practice charge was dismissed on October 10, 1969, unblocking the decertification process, but Monroe failed to receive notice of the dismissal until 11:00 a. m. on Monday, October 13. On that day, pursuant to a decision made during

---

3. Though formerly components of a single operating division, Monroe and ABS were reorganized into separate divisions in 1966, each with its own management and labor policies.

the prior week and beginning at 8:00 a. m., Monroe began a series of interviews with the employees, announcing certain wage and benefit changes to become effective October 6, 1969. Monroe did not mention the union during the interviews, and, when questioned what would happen if the union won the election, the Company indicated it would negotiate from the position of the parties at the time of the beginning of the negotiations. The changes were granted pursuant to a management decision to make certain economic improvements since there apparently was no prospect of immediate resolution of the various matters pending before the Board, and the need for improvements at Monroe's facility was obvious and pressing.

On October 22, 1969, the parties agreed to an election to be conducted on November 13, 1969. At the election 36 votes were cast against the union as bargaining agent and 22 votes in favor of the union.

The Board concluded that the wage and benefit increases granted by Monroe were not based on legitimate economic concerns but were timed to influence the outcome of the election and contends on appeal that its conclusion is supported by substantial evidence on the record as a whole.

■ We cannot agree with the ruling of the Board. A careful reading of the record convinces us that there is no substantial evidentiary support upon the record as a whole for the Board's findings of a violation of § 8(a) (1) of the Act. Universal Camera Corp. v. N.L.R.B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

*Universal Camera* teaches that the findings of the Board must be supported by substantial evidence on the record as a whole; that the findings of the Trial Examiner are part of the record; and that evidence supporting a conclusion may be less substantial when, as in the present case, a Trial Examiner, who has seen and heard the witnesses, reaches a conclusion contrary to that of the Board, particularly if the credibility of witnesses is important in the case.

The record shows without contradiction that Monroe was economically justified in granting the wage and benefit increases. The Company had experienced increased difficulty in recruiting and retaining unit employees since 1966 because its wage rates were below area standards. Monroe's unilateral efforts to improve wages and benefits were necessary to make the company competitive in the area labor market. Once Monroe had come forward with a substantial and legitimate business justification for its conduct, the burden was on the Board to show that the improvements were granted for the purpose of influencing the outcome of the election. N.L.R.B. v. Gotham Industries, Inc., 406 F.2d 1306 (1st Cir. 1969). The Board has not sustained its burden, nor does the record support the Board's conclusion that the increases were granted for the unlawful purpose of influencing the employees' choice in the election.

Moreover, the granting of improvements in wages and benefits on October 13 was not timed so as to influence the election. The record clearly demonstrates that when Monroe commenced granting benefits at 8:00 a. m. on October 13, it had not received notice of the Regional Director's dismissal of Doyle's third unfair labor practice charge. Thus, at the time the Company decided to grant the increases and to implement its decision, Doyle's third charge was still effective as a "block" to further election proceedings, for, according to Board procedures, the filing of an unfair labor practice charge during the pendency of a representation proceeding generally will (and in this case *did*) block the processing of a decertification petition. A petition is not "unblocked" until the charge is dismissed. Until 11:00 a. m. on October 13 when it received notice of the dismissal of Doyle's third charge, Monroe had no idea when an election would be scheduled because the charge had operated to suspend all processing of the decertification petition.

This distinguishes our case from that of Owens-Corning Fiberglas Corp. v. N.L.R.B., 407 F.2d 1357 (4th Cir. 1969), in which we held *inter alia* that the extension of wage differentials for various shifts and the improvement in maternity leave benefits during the pendency of a runoff election constituted a violation of § 8(a) (1) of the Act. However, in the *Owens-Corning* case, the election proceeding was not being blocked by an unfair labor practice charge[4] as in the present case. Thus, the employer in *Owens-Corning* had no reason to doubt that the runoff election, though unscheduled, was imminent.

Since there is no evidence linking Monroe to the filing of the decertification petition or the unfair labor practice charges by Doyle, Monroe's conduct in implementing wage and benefit increases on October 13 *before* receiving notification of the dismissal of the unfair labor practice charge was economically justified and was not instituted in order to influence the outcome of the decertification election.

On October 31, 1969, as part of Monroe's campaign to defeat the union in the upcoming decertification election, Monroe's president, Donald R. McMahon, sent a letter to all unit employees, which read in pertinent part:

> We are dedicated to the principle of the dignity of each individual, and I feel very strongly that each employee should share in our programs of increased wages, better fringe benefits and pension plans. This will be possible if we have no union.

The Board overruled the decision of the Trial Examiner and found that McMahon's letter constituted an unfair labor practice under § 8(a) (1) of the Act on the ground that it threatened Monroe's employees with economic reprisals if they assisted or supported the union. In particular, the Board found objectionable that part of the letter which stated "[t]his will be possible if we have no union."

Once again, the basic issue before us is whether there is substantial evidence upon the record as a whole to support the Board's ruling. Universal Camera Corp. v. N.L.R.B., *supra*. After careful consideration of the entire record, we conclude that there is a lack of substantial evidence to support the Board's decision that the letter of October 31 violated § 8(a) (1) of the Act.

In the context of a hard-fought election campaign, we find little evidence that the McMahon letter exceeded the permissible bounds of campaign rhetoric or that it could be construed by employees as threatening the loss of economic benefits.

The unrebutted testimony of the employer reveals that the wage and benefit increases would remain in effect even if the union won the election, and that McMahon's letter was written in response to union letters of October 27 and 30.

Even when McMahon's letter is viewed in isolation, we find no probative evidence to support the conclusion that the proffered benefits would be permanently instituted *only* if the union were decertified. A fair reading of the letter persuades us that there was no veiled threat or coercion contained therein.

The Decision and Order of the Board is hereby reversed and the Board's cross-application for enforcement is denied.

---

4. The company in *Owens-Corning* had filed objections to the earlier election based on the conduct of the teamsters union, but we find no indication of the filing of any unfair labor practice charges. The Board's procedure for blocking a representation election, by its own terms, applies only when unfair labor practice charges are filed with the Board, not merely when objection to an election are raised.