**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**GRUBER'S SUPER MARKET, INC., Respondent.**

**No. 73-1269.**

United States Court of Appeals, Seventh Circuit.

Argued Jan. 15, 1974.

Decided Aug. 15, 1974.

---

Elliott Moore, Acting Asst. Gen. Counsel, William M. Bernstein, Atty., N.L.R.B., Washington, D. C., for petitioner.

Frank B. Gilmer, Chicago, Ill., for respondent.

Before HASTINGS, Senior Circuit Judge, and PELL and SPRECHER, Circuit Judges.

PELL, Circuit Judge.

The National Labor Relations Board (Board) seeks enforcement of its order issued February 5, 1973, against Gruber's Super Market, Inc. (Gruber's) (201 NLRB No. 98).

The principal issue before the court is whether a *Gissel* [1] order should be enforced when there has been a single act of unfair labor practice of arguable demonstrability and an absence of either any other indication of anti-union bias or interference with protected employee rights under the National Labor Relations Act.

## I.

Gruber's had owned and operated a supermarket in South Bend, Indiana, for the better part of a decade. In June 1970 it purchased a second supermarket, located in Mishawaka, Indiana, about nine miles from the first store. Although separate political municipalities, South Bend and Mishawaka are in appearance one continuous municipality, and the two stores catered to the same general buying public, were operated similarly, and, from time to time, employees were interchanged between the stores.

A Board election was held on August 16, 1971, at the Mishawaka store and as a result the Retail Clerk's Union Local 37, a/w Retail Clerk's International As-

---

1. NLRB v. Gissel Packing Co., Inc., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969).

sociation, AFL–CIO (Union), was certified as the bargaining agent. The record does not reflect that any attempt was made to have the appropriate unit consist of the employees of both stores.

At about the time of the Mishawaka certification, the Union, having nine authorization cards from the South Bend employees, a majority of the thirteen eligible employees, requested recognition at the South Bend store at the same time it submitted a proposed contract for Mishawaka. Gruber's indicated it wanted an election, which in due course was scheduled for September 30, 1971.

After business hours on September 27, James Gruber, vice president of Gruber's and manager of the South Bend store, called a meeting at that store of the eligible employees there. The remarks made by James Gruber on that occasion, although occurring more than six months prior to the charged unfair labor practice and therefore themselves not a basis for such a charge, were considered by the Administrative Law Judge (ALJ) as shedding light on the true character of matters occurring within the limitation period.

The election was held as scheduled and resulted in a 5–5 vote. On October 8, 1971, the Union filed objections to the conduct of the election,[2] alleging, *inter alia*, that management had interfered with the election by promising the employees wage increases if they voted against the Union.[3]

On February 16, 1972, a hearing was held on the objections. On April 5, 1972, Gruber's granted the South Bend employees wage increases comparable to those that had been negotiated at the Mishawaka store and put into effect there in late December 1971. On April 10, 1972, the Hearing Officer issued his report on the Union's objections to the September 30th election; he recommended that two objections be sustained, the election be set aside, and a second election held. Gruber's filed no exceptions to the report, and, on June 8, 1972, the Board adopted the Hearing Officer's recommendations.

Subsequent to the wage increases but prior to the Board's decision on the election objections, the Union had filed unfair labor practice charges. Adopting the findings and recommendations of the

2. Gruber's argued that the Board deprived it of due process by accepting the Union's objections as timely filed even though they were received in the Board's Indianapolis Regional Office the day after October 7th, the date section 102.92(a) of the Board's Rules and Regulations required. The Board concedes that early decisions appear to impose a rigid requirement that the Regional Office actually receive objections on or before the due date. See Dunn Motor Co., 100 NLRB 822 (1952) (objections refused where mailed day before due date but received one day late). Since the Board's decision in Rio de Oro Uranium Mines, Inc., 119 NLRB 153 (1957), however, the test of compliance with section 102.92(a) is whether "it could be reasonably assumed [by the party filing objections] that its actions would have effected timely delivery." Hughes Tool Co., d/b/a KLAS–TV, 197 NLRB No. 178 (1972), 80 LRRM 1479, n. 21. Thus, in Rio de Oro the Board accepted the employer's objections although they were received a day late because they had been sent airmail, registered, special delivery from Albuquerque,

New Mexico, to Fort Worth, Texas, about noon of the day before the due date.

Here, the mailing did occur only the day before the objections were due, but there was testimony by a South Bend post office employee in charge of routing that a letter so mailed would normally be delivered in Indianapolis the next day. The Board concluded that the processing of objections received under these circumstances accords with Board policy. We, merely noting that the events transpired in 1971 rather than 1974 when the testimony might well have not been available or at least not entirely credible, cannot disagree with the determination made by the Board.

3. The other allegations were that Gruber's had "unlawfully threatened employees with loss of hours and jobs if they voted for the Retail Clerks Union" and that it "unlawfully misrepresented Board procedures concerning the time a second election could be held if they voted against the Retail Clerks Union." After an administrative investigation, the Regional Director recommended that the latter objection be dismissed.

ALJ, the Board found that Gruber's had violated section 8(a)(1) by granting its South Bend employees wage increases in order to discourage support of the Union and section 8(a)(5) by refusing to recognize the Union on the basis of the authorization cards signed by a majority of the employees in the appropriate unit. In the order which is the subject of the present petition, the Board required Gruber's to cease and desist from giving wage increases in order to discourage support of the Union, to bargain collectively with the Union, upon its request, and to post an appropriate notice.

## II.

Turning first to the 8(a)(1) violation, we will, as did the ALJ, look first at the meeting with the employees three days before the election to determine what light is shed on the granting of the wage increase more than six months later, during which period there is no indication of any anti-union activity on the part of the company.

For the present purpose, we note the statement of the Board in its brief to this court:

"He [James Gruber] asked each employee why he wanted a union. Most employees said they were concerned about their wages. Gruber said that the Company could not afford to give them wage increases at that time because of expenses incurred in opening the Mishawaka store and reminded the employees that the national 'wage freeze' had been on since August 15. He said that if the Union did not win the election, the South Bend employees would get a raise comparable to any negotiated for the Mishawaka store employees. He added that the employees should give the Company a chance and pointed out that the employees would have another opportunity to vote for the Union after a period of time if management failed to satisfy them." (Citations omitted.)

The light shed on the April wage increases is a caliginous one. We have difficulty in finding much illuminative significance in the request that the company have a chance and the statement that the employees could vote for the Union at a later election. While the remarks conveyed the impression that management would prefer a nonunionized South Bend store, we are unaware of any legal preclusion of management's right so to express itself. Further, these remarks must be examined in the context of Gruber's statements that the company policy because of the interrelated nature of the stores was to maintain basically the same pay scale at the two stores.

The ALJ, whose decision was adopted by the Board, did not discredit the testimony that the policy of uniformity had been established when the second store was purchased but rather apparently brushed it aside as being without great significance. Giving due deference to the expertise of the Board in such matters, we nevertheless have difficulty in consigning to the waste heap such an obviously true fact of economic life which is bound to occur in the operation of multiple, similar type stores in a single wage area. Whether employees of a nonunion plant of the employer will choose to ride dues free on the coat tails of employees in another plant of the company which has been unionized and which is located and operated in a place and a manner so as virtually to mandate the maintenance of uniform working conditions and wages is a choice not infrequently put. We further are not unmindful that when the choice is put, a majority of voting employees will frequently determine that they prefer to dispense with the free ride in favor of union representation. We know of no reasons that the employees at Gruber's were not entitled to be informed of the obvious truth as to the uniformity factor. The Board itself has on numerous occasions in representation proceedings recognized the uniform-treatment fact of economic life by authorizing area-wide bargaining units in cases of multiple stores in a metropolitan area simply

because uniformity of conditions promotes industrial peace, a primary objective of the National Labor Relations Act. See, *e. g.*, The Interstate Company, 118 NLRB 746 (1957); The Great Atlantic & Pacific Tea Company, 119 NLRB 603 (1957); Food Fair Stores, Inc., 120 NLRB 497 (1958); Katz Drug Company, 123 NLRB 1615 (1959); Chicago North Side Newspapers, 124 NLRB 254 (1959); Interstate Co., Glass House Restaurants, etc., 125 NLRB 101 (1959).

The ALJ, however, found that James Gruber in September had promised comparable wages if the employees "voted against the Union at the election." The testimony in the record, without regard to James Gruber's testimony, is extremely equivocal. It is susceptible of interpretation as a promise on the one hand of an increase in wages contingent upon several factors including voting against the Union. But it is equally susceptible on the other hand of interpretation as a statement that, whether or not there was a union at the South Bend store, under the uniform policy for the two stores wages comparable to those negotiated at Mishawaka could be expected.[4]

Despite the ambiguity of the remarks as reported in the testimony and the fact that on the basis of the remarks the employees might well have concluded that to assure the wage increases they should indeed vote for the Union rather than against it, we will proceed on the basis that some nebulous light was shed on the subsequent unilateral wage increases, to which we now turn.

## III.

The employer's reasons for its actions determine whether the employer violates section 8(a)(1) by conferring benefits either during an election campaign or after an election, while objections are pending. For example, no violation occurs if the wage increases an employer grants are simply implementations of its well-settled practice of periodic raises; or, absent such a practice, compelling business reasons justify the employer's unilateral decision to furnish the new benefits. However, section 8(a)(1) "prohibits . . . conduct immediately favorable to employees which is undertaken with the express purpose of impinging upon their freedom of choice for or against unionization and is reasonably calculated to have that effect." NLRB v. Exchange Parts Co., 375 U.S. 405, 409, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964). See NLRB v. Furnas Electric Co., 463 F.2d 665, 669 (7th Cir. 1972); NLRB v. Drives, Inc., 440 F.2d 354, 363 (7th Cir. 1971); Texaco, Inc. v. NLRB, 436 F.2d 520, 524 (7th Cir. 1971); General Teamsters & Allied Workers Union No. 992 v. NLRB, 138 U.S.App.D.C. 312, 427 F.2d 582, 586 (1970).

The ALJ found—and the Board agreed—that the purpose (and effect) of Gruber's grant of wage increases at a time when it faced the possibility of a rerun election was to erode Union support among the employees at the South Bend unit. Gruber's, however, main-

---

4. Douglas Way, a part-time stock clerk, testified at the February 1972 hearing that Gruber had declared ". . . if we didn't get a union in we would be, you—*I don't know if he exactly said if we didn't,* but he said we would get . . . a raise comparable to the other store as soon as they got done negotiating." (Emphasis added.) At that same hearing, David Jozwiak stated that ". . . there was the question of salary and *I can't recall too much about that,* but I recall something that he said that we would receive a raise, *I guess,* if the union wasn't in we would receive a raise." (Emphasis added.) Ken Horvath, a former stock clerk at the South Bend store, testified that Gruber had said "if we didn't have a union our wage could be comparable to the union contract with [the Mishawaka employees]." At the August 10th hearing, former employee Howard Sappington testified that Gruber had said, "[I]f we didn't get a union that we would get our raise comparable to the Mishawaka store once their negotiations were over . . . ." And Margaret Ellis, a ten-year veteran, testified that Gruber had not promised the employees wage increases if they voted against the Union. "No, that was not the promise, if we voted against it. Just that we would get a raise when it was possible for them to give us one."

tains that it acted from lawful economic motives, not anti-Union animus.

As we have indicated, the timing of wage increases or other benefits unilaterally conferred is a significant factor in section 8(a)(1) cases. Here, Gruber's granted substantial increases while the Union's objections to the pre-election conduct of management in September 1971 were still pending. The hearing on those objections had taken place seven weeks prior to the grant, on February 16, 1972. The Hearing Officer issued his report, critical of management's conduct and recommending the holding of a second election, just five days after Gruber's gave its South Bend employees the wage increases. The changes in hourly rates ranged from 20 cents to one dollar and were comparable to the increases that the Union had negotiated for the employees at the Mishawaka supermarket and which had gone into effect there in December 1971.

Although the Mishawaka acquisition occurred in June 1970, the record does not unequivocally establish that the South Bend employees had been informed of Gruber's asserted parity policy until September 27, 1971—three days prior to the scheduled representation election and after Mishawaka employees had become unionized. Even if we assume, *arguendo,* that James Gruber did not commit management to a wage hike only if the employees should reject the Union, the announcement at that juncture of a uniform wage policy suggests an attempt to obviate the employees' need for the Union. Further, if the South Bend workers had been previously informed about the corporation's supposed policy, they saw no evidence of it until April 1972, when management and the Union were embroiled in an election controversy.

The ALJ found that Gruber's had "failed to show that there was any

build-up of employee pressure for more money prior to April 5th, much less a staffing problem which hampered the Company's conduct of business." [5] The record supports this evaluation. According to members of the Gruber family, they received, at most, seven or eight inquiries, made by three or four of the employees, about wages. Four of these inquiries occurred between September and December, that is, before management had decided to grant the increases. The two veteran employees who raised the matter after December accepted the response—that the Union's objections would first have to be resolved—with no intimation that they might leave their jobs. Furthermore, between September 1971 and April 5, 1972, only two employees who had voted in the election left Gruber's employment. And the assertions of the corporation's officials that they were experiencing difficulty finding help were confirmed by no objective evidence. In sum, in rebuttal Gruber's failed to show that it had suffered such injury as to justify its unilateral action while the Board was processing the Union's objections, the sustaining of which probably would require that a rerun election be held.

As for the time lag, on which Gruber's relies, although the hearing on the objections arising out of the September 1971 election did not take place until February 1972, there was no reason for the corporation's officials to assume that the Hearing Officer would not soon issue his decision and recommendations. The pay increases could not have been granted in pursuance of the management's parity policy until December or January, and Gruber's counsel at that time advised the corporation's officials against taking such action. After so long a period of no raises, it is "curious," as the Board in its brief remarks, that Gruber's decided it could not wait for the decision of the Hearing Officer

---

5. Of course, this has double-edged implications for the *Gissel* issue since the lack of employee pressure for an increase would have some tendency to minimize the impact of the unilateral wage increase on free choice in an election.

at least. See NLRB v. Furnas Electric Co., 463 F.2d 665, 669 (7th Cir. 1972), where we sustained a Board finding "that the Company's announcement of an increase in wages and benefits, prior to knowledge of the date that a new election was to be held, and while exceptions were pending before the Board, was an unfair labor practice." *Contrast* Monroe v. NLRB, 460 F.2d 121, 124–125 (4th Cir. 1972).

"The question on this review is not whether we would have interpreted the employer's intention as did the Board in the first instance, but whether the Board's resolution of this factual issue is supported by substantial evidence on the record considered as a whole . . . ." Luxuray of New York v. NLRB, 447 F.2d 112, 118 (2d Cir. 1971). Although Gruber's conduct here was not blatant like that of the employer in *Texaco, Inc., supra,* or transparently manipulative like that condemned in Tower Enterprises, Inc., 182 NLRB 382 (1970), enforced, 79 LRRM 2736 (9th Cir. 1972), the Board did, in our opinion, satisfy its burden of proof. *Contrast* NLRB v. Ambox, Inc., 357 F.2d 138, 141 (5th Cir. 1966), where the employer "made clear that the increases would be granted retroactively as soon as the election objections were cleared up, and the promise of benefits was not made dependent on the outcome of the election proceeding." Under these circumstances, not found to be present in our case, the Fifth Circuit concluded that "[t]o extend the pre-election prohibition to the post-election period . . . would unnecessarily seriously curtail the rights of employers and employees."

█ Although we consider the case a close one, on the basis of the scope of our review, we uphold that part of the Board's decision and order which found that Gruber's by granting wage increases on April 5, 1972, had violated section 8(a)(1) and which required it to cease and desist from such conduct in the future.

IV.

We turn now to the section 8(a)(5) violation and the Board's bargaining order.

In *Gissel,* 395 U.S. at 579, 89 S.Ct. at 1922, 23 L.Ed.2d 547, the Court held, *inter alia,* that "a bargaining order is an appropriate and authorized remedy where an employer rejects a card majority while at the same time committing unfair labor practices that tend to undermine the union's majority and make a fair election an unlikely possibility . . . ." Although the Court eschewed a *per se* rule, it did approve the issuance of a bargaining order (1) in "exceptional" cases marked by "outrageous" and "pervasive" unfair labor practices if their "coercive effects" cannot be eliminated by traditional remedies, and (2) "in less extraordinary cases marked by less pervasive practices which nonetheless still have the tendency to undermine majority strength and impede the election processes." *Id.* at 613–614, 89 S.Ct. at 1940.

This case, as Parts II and III of our opinion indicate, clearly does not involve "outrageous" unfair labor practices. Because the Union had a valid card majority when it requested recognition, the remaining—and determinative—issue is whether the present situation falls within the second broad category mentioned in *Gissel.*

In Peerless of America, Inc. v. NLRB, 484 F.2d 1108, 1118 (7th Cir. 1973), we reminded the Board that

"[w]e have consistently held that *Gissel* contemplates that the Board must make 'specific findings' as to the immediate and residual impact of the unfair labor practices on the election process and that the Board must make 'a detailed analysis' assessing the possibility of holding a fair election in terms of any continuing effect of misconduct, the likelihood of recurring

misconduct, and the potential effectiveness of ordinary remedies." [6]

The Board's decision here consists of stark conclusions; *Gissel* and *Peerless*, however, demand that the Board provide a satisfactory explanation for its choice of a bargaining order as a remedy for employer unfair labor practices where the union claims to represent a majority of the employees in a unit on the basis of authorization cards. The decision here furnishes no specifics as to why "the risks that a fair rerun election might not be possible were too great to disregard the desires of the employees already expressed through the cards." *Gissel, supra*, 395 U.S. at 615, 89 S.Ct. at 1941.[7]

The Board's reliance on judicial deference to administrative expertise is misplaced.[8] As Judge Cummings pointed out in *Peerless, supra*, 484 F.2d at 1118 n.16, the Board's presumed expertise "does not relieve the Board of its responsibility to explain its conclusions

in terms reviewing courts can understand." *Cf.* NLRB v. General Stencils, Inc., 472 F.2d 170, 175 (2d Cir. 1972).

The usual course for a reviewing court that finds the Board's actions unsatisfactory—as we have here—is to remand the matter so that the agency may supply the missing findings and analysis. *Peerless, supra*, 484 F.2d at 1119; *cf.* NLRB v. Food Store Employees Union, Local 347, 417 U.S. 1, 8–11, 94 S. Ct. 2074, 40 L.Ed.2d 612 (1974). However, "[w]e conclude on analysis of the simple facts involved that we would be abdicating our judicial function and shirking our responsibilities if we ever enforced a bargaining order in this case. Consequently, in our desire to avoid needless and futile delay, we shall make the essential analysis and deny enforcement." *Peerless, supra*, 484 F.2d at 1120.

■■ We first note that, contrary to the Board's contention, the record does not reveal the employer's open, continu-

---

6. *See* the dissent of Chairman Miller in General Stencils, Inc., 79 LRRM 1608, 1611, 1613 (1972), enforcement of bargaining order denied, 472 F.2d 170 (2d Cir.) :

"No recent decisional task has more perplexed this Board, or confounded the courts which review our decisions, than that committed to us in Gissel: To determine whether an order to bargain is an appropriate remedy for employer interference with rights protected in Section 7 . . . . The standards by which we must decide whether to enter [such] an order . . . are uniquely amorphous. . . . The Court . . . made abundantly clear . . . that the aim of our inquiry must be somehow to quantify the impact upon employees which follows from unlawful conduct by their employer. . . . I do not doubt that the statements by Respondent could have affected the election atmosphere, interfered with the free exercise of employee choice, and prevented the conduct of a fair rerun election. In my view, however, there is not sufficient showing that occurred." [Footnotes omitted.]

7. The Board's justification for the imposition of a bargaining order was that

"Respondent's conduct in giving all the employees in the bargaining unit a substantial wage increase, in violation of Section

8(a)(1), is such as to have a lingering effect and to make it unlikely that the use of traditional remedies will insure a fair rerun election. . . . The unambiguous cards . . . therefore represent a more reliable measure of employee desire on the issue of representation in this case. . . . Accordingly, . . . Respondent by refusing to recognize the Union on the basis of its authorization cards engaged in conduct violative of Section 8(a)(5) of the Act. . . . The Board has held that a bargaining order is warranted under *Gissel* where, as here, an employer refuses recognition cards from a majority of the employees . . . and thereafter grants substantial wage increases to a high percentage of the employees in violation of Section 8(a)(1) of the Act. C & G Electric, Inc., 172 NLRB 426; Tower Enterprises, Inc., 182 NLRB 382, note 1." [Footnote omitted.]

8. In its brief, the Board placed some emphasis on a footnote to the *Gissel* opinion, 395 U.S. at 612 n. 32, 89 S.Ct. at 1939, which provides in part: "In fashioning its remedies under the broad provisions of § 10(c) of the Act (29 U.S.C. § 160(c)), the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts."

ous hostility to the Union. An employer's lack of enthusiasm for the unionization of his workers is not the equivalent of "anti-union animus." James Gruber's remarks, if injudicious, were also ambiguous. Further, for the purpose of our ascertaining the reasonableness of a bargaining order, the context in which wage increases occurred is significant, even though the granting of those increases constituted an 8(a)(1) violation. Unlike the employer in *Tower Enterprises, Inc., supra,* Gruber's did not award wage increases hot on the heels of the union's demand for recognition. Also, the business justifications asserted by the employer in *Tower* were clumsy makeweights; Gruber's reasons, in contrast, though found not to be sufficiently supported by evidence in the record to rebut successfully the Board's determination, comport with those that any owner of two small similar stores would be likely to offer, and, as we have previously observed, with the facts of economic life.

Second, the record does not disclose that, following James Gruber's talk, the South Bend employees lost interest in the Union. Indeed, the next day, that is, two days before the election, some if not all the unit's employees attended an informational meeting sponsored by the Union. *Contrast Texaco, Inc., supra,* where, subsequent to two sessions with Texaco's supervisor of employee relations and the rectification of employment grievances, the employees wrote the union informing it that they no longer desired its representation.

Third, the entry of the section 8(a)(1) cease and desist order and the posting of an appropriate notice about it will decrease the likelihood of the recurrence of misconduct by the employer. And the employees will be informed of the kinds of benefits the granting of which the Board finds improper. In addition, the employees will be on notice that the employer has been determined to have been guilty of an unfair labor practice.

We place some, though not controlling, weight on the changed composition of the work force at the South Bend store. Almost half the work complement at the times pertinent here have left Gruber's employment; most of these former employees were high school students who went on to college or to other positions. *See Peerless, supra* at 1121; NLRB v. General Stencils, Inc., 472 F.2d 170, 175 n.5 (2d Cir. 1972). "Since it is the present work force that stands to be deprived of exercising its free choice in the preferred election process, the fact that it is substantially different from the one which existed at the time of the misconduct militates against issuance of a bargaining order where, as here, that drastic remedy is not otherwise clearly warranted." *Peerless, supra,* 484 F.2d at 1121.

The ordinary Board procedures applicable to the determination of whether a unit of employees desires to be represented by a union make available to the employer the privilege of calling for a governmentally-supervised secret election. This is as it should be in a democracy. Of course, in many instances the use of authorization cards provides an expeditious route to industrial harmony. On the other hand, pressures to sign authorization cards are not unknown, *cf.* NLRB v. Urban Tel. Corp., 499 F.2d 239 (7th Cir., 1974), and, because of personal factors arising out of the daily working relationship among fellow employees, are not always easily resisted. The voting booth, where no one looks over the employee's shoulder, is the ideal forum for the expression of the free choice of each employee. It is only when one of the prongs of *Gissel* becomes an onlooker in the booth that there should be a resort to the forced recognition of the bargaining order, which may or may not be in accord with the desires of the majority of those affected.

In sum, a bargaining order in the present case is unwarranted and unreasonable. "[T]he concededly superior election process should take its course." *Peerless, supra.*

Accordingly, we deny enforcement of that part of the Board's order directing Gruber's to bargain with the Union. However, we enforce the Board's determination of an 8(a)(1) violation and its cease-and-desist directive on that point. The Board's proposed notice, of course, will have to be modified to conform with our holdings.

SPRECHER, Circuit Judge (concurring in part and dissenting in part).

I concur in that portion of Judge Pell's opinion whereby the Board's order is enforced.

I dissent from the denial of enforcement of that part of the order directing the employer to bargain with the union. My reason for doing so is that I believe that the promise of wage increases three days before the election had "the tendency to undermine majority strength and impede the election processes." National Labor Relations Board v. Gissel Packing Co., 395 U.S. 575, 614, 89 S.Ct. 1918, 1940, 23 L.Ed.2d 547 (1969).

The nine employee authorization cards out of thirteen employees indicated that only four employees were opposed to the union shortly prior to the election. After the promised wage increase, the election vote was five to five, indicating the change of only one vote as definitely opposed to the union. Three employees, on the other hand, who had apparently signed cards were influenced enough to abstain from voting without having changed their labor philosophy to that of anti-union. In other words, they were temporarily mollified. This tends to show as much causal connection between the promised increase and the tainted vote as can ever reasonably be traced.

The Board's analysis of the possibility of holding a fair election under these circumstances (footnote 7 of majority opinion) are sufficient "specific findings" in my view to satisfy Peerless of America, Inc. v. National Labor Relations Board, 484 F.2d 1108 (7th Cir. 1973).