**LUXURAY OF NEW YORK, DIVISION OF BEAUNIT CORPORATION,** Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**Nos. 619, 620, Dockets 35334, 35485.**

United States Court of Appeals, Second Circuit.

Argued March 22, 1971.

Decided June 30, 1971.

Waterman and Hays, Circuit Judges, filed opinions concurring in part and dissenting in part.

Andrew C. Partee, Jr., Kullman, Lang, Keenan, Irman & Bee, New Orleans, La., for petitioner.

Corinna Lothar Metcalf, Atty., Washington, D. C. (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Thomas E. Silfen, Atty., Washington, D. C., on the brief), for National Labor Relations Board.

Before WATERMAN, KAUFMAN and HAYS, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

A petition for review and cross-application for enforcement of an order of the National Relations Board are before us. The order rests in the main upon the Board's finding that petitioner Luxuray of New York Division of Beaunit Corporation committed three unfair labor practices in connection with an organizing campaign at Luxuray's Fort Plain, New York plant. The campaign, undertaken by the International Ladies Garment Workers' Union in the early months of 1969, resulted in the union's defeat in a representation election held September 19, 1969. Subsequently, as we will discuss in more detail, this election was set aside and a new election has been ordered. The discord between the parties here over each facet of the Board's order requires that we refer to several basic policies of labor relations law for a principle of resolution, since the facts are not in dispute.

I.

As the first stage of its organizing effort, the union named several employees to an organizing committee. This committee met several times during February and early March, 1969. One of these meetings was held at the home of a Fort Plain employee and committee member, Mrs. Catherine Coppernoll. In their testimony before the trial examiner, two representatives of the company, Ernest Eely, a supervisor, and Donald Shults, Plant Manager at Fort Plain, admitted that they conducted surveil-

lance of this meeting. At the instance of Shults, who wanted "to find out how many people were going to attend the meeting," Shults and Eely drove to Mrs. Coppernoll's home in a borrowed car, to avoid being recognized, and parked nearby at a convenient vantage point for about forty-five minutes. After identifying at least two employees arriving for the meeting, Shults and Eely drove past the Coppernoll house in an apparent fruitless attempt to identify other employees' cars, and then returned to Fort Plain. No employee ever learned of the surveillance. The little information garnered by the expedition was never used, and indeed soon became superfluous when in early March the union volunteered to management the names of the eleven members of the organizing committee. Shults testified that he subsequently learned that the surveillance was improper and was not to be repeated, and in fact it was not. Admittedly, the surveillance had no effect whatever on the union's organizing efforts and played no part in the union's eventual election defeat.

■ Luxuray does not seek to overturn the conclusion of both the Trial Examiner and the Board (nor did it make such effort before the Board) that the surveillance constituted an unfair labor practice in contravention of Section 8(a) (1) of the National Labor Relations Act, see, e. g., N. L. R. B. v. Standard Forge & Axle Co., 420 F.2d 508, 510 (5th Cir. 1969), cert. denied, 400 U.S. 903, 91 S.Ct. 140, 27 L.Ed.2d 140 (1970); N. L. R. B. v. Comfort Inc., 365 F.2d 867, 870 (8th Cir. 1966). Rather, the company calls upon us to exercise our narrow power to review the Board's expert choice of an appropriate remedy, see N. L. R. B. v. Gissel Packing Co., 395 U.S. 575, 612 n. 32, 89 S.Ct. 1918, 1939, 23 L.Ed.2d 547 (1969),[1] and hold that the single episode of surveillance proved

will not as a matter of law support a cease-and-desist order.

In enforcing this aspect of the Board's order, we do not pass judgment on the propriety of decisions of two Circuits, International Union, United Auto, Aerospace and Agr. Implement Workers of America v. N. L. R. B., 427 F.2d 1330 (6th Cir. 1970); International Woodworkers of America, AFL–CIO, Local 3–10 v. N. L. R. B., 127 U.S.App.D.C. 81, 380 F.2d 628, 630, 631 (D.C. Cir. 1967), holding that the mandatory language of Section 10(c) of the Act means just what it appears to say, namely that whenever the Board finds an unfair labor practice it "shall issue" an appropriate cease-and-desist order. The efficacy of a remedial order is not measured only by the specific gravity of the offense that is its progenitor. We may assume, without deciding, that the Board in an appropriate case can balance the detrimental effects of an order if issued on labor-management relations, and refuse to issue one. The Board here informs us that the order is appropriate to protect against the resumption of previous unlawful activity. Since, following the union's election defeat, the election was set aside (for reasons which will appear below), the Board cannot be faulted for attempting to ensure that the reelection is not also infected with the unfair labor practices which occurred during the first campaign. By its order the Board guarantees to the union that it will not have to start all over again at a new hearing before a Trial Examiner to secure a remedy should the employer repeat its unlawful surveillance. We cannot say that the Board's evaluation is without legal justification.

## II.

Following receipt of the employees' names who were members of the union's organizing committee, the management

---

1. "In fashioning its remedies under the broad provisions of § 10(c) of the Act (29 U.S.C. § 160(c)), the Board draws on a fund of knowledge and expertise all its own, and its choice of remedy must therefore be given special respect by reviewing courts."

at Fort Plain held several meetings during working hours. At some of these, the management made known its general anti-union attitude, and it appears that the members of the organizing committee as well as other employees thought to be pro-union were excluded from meetings at which the union's organizing drive was discussed. In addition, company officials distributed or mailed to employees, or attached in their paychecks, a number of anti-union propaganda leaflets with the often repeated refrain that unions cause employees more trouble, primarily because of strikes, than they are worth.

The only issue before us is whether Luxuray violated Section 8(a)(1) of the Act by showing to employees at one of the anti-union meetings from which pro-union employees were excluded, a film, which might appropriately be characterized as propaganda, entitled "And Women Must Weep." Prior to showing the film, Sidney Foreman, Director of Manufacturing of the Consumer Product Division of Beaunit Corporation read to the employees a prepared written statement to the effect that the events depicted were true although the film was a dramatization by professional actors. Foreman also observed that the setting of the strike portrayed in the film was a small town like Fort Plain and warned that similar events "could happen to us people, our community, our friends."

The film itself has apparently become something of a standard tool in anti-union campaigns. The Fifth Circuit has accurately described its contents:

It is in color. It tells the story of a strike in Princeton, Indiana. The actors and actresses are professionals. The film is narrated by one of the actresses who plays the part of the wife of a minister whose parishioners are involuntarily involved in the strike as members of the union. They are among the union members who are dictatorily mistreated by the majority of the union members. The majority provoked the strike to serve the wrongful ends of one union officer. The minority of the members who oppose the strike are deprived of their rights by the majority. The strike was called without consulting the International.

Among other baneful events, the film shows picket line violence, the minister being jeered, smashed windshields, slashed tires, and upturned automobiles, all caused by the majority members of the union. The minister's wife is threatened by an anonymous caller who announces that her home will be the next to be bombed. The minister is shown with a rifle, sitting through the night, in an effort to protect his family. The climax of the fray is reached when the strikers fire into the trailer home of a dissenting union member and a bullet strikes his baby in the head. The film closes with the end of the strike and with the announcement that the baby will live. The closing words of the narrator are: "All you have to do is ask yourself, could my town be next? And if you think that the answer of what happened to us couldn't happen to you, remember that is what we thought in the beginning. Must you wait to come face to face with tyranny as we did."

Southwire Co. v. N. L. R. B., 383 F.2d 235, 239–240 (5th Cir. 1967).

By a vote of two to one, the three-member Board panel agreed with the Trial Examiner that by showing the film, the company violated Section 8(a)(1) of the Act, which prohibits an employer "to interfere with, restrain, or coerce employees in the exercise" of their Section 7 rights. As a corollary, the Board found the film unprotected by the "free speech" amendment of the Labor Management Relations Act of 1947, Section 8(c) of the N.L.R.A., which provides that speech "shall not constitute or be evidence of an unfair labor practice * * * if such expression contains no threat of reprisal or force or promise of benefit." Relying primarily on N. L. R. B. v. Gissel Packing Co., 395 U.

S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Board appears to advance two theories under which showing the film might be found unlawful under the Act: (1) That, especially in light of Foreman's introductory remarks, the film impliedly made "representations as to the dire results of unionization which are both factually unsupportable and coercively misleading." (2) That the violence and misconduct depicted in the movie is unlikely to occur absent either knowing acquiescence or active encouragement by the employer—thus, by this latter theory, the employer in effect threatened to encourage union violence, for example by refusing to bargain collectively, should the instant union win the election. We believe that both theories fail.

*Gissel* is distinguishable in a respect that this court has repeatedly emphasized as a particularly important factor in determining whether employer anti-union statements constitute an unfair labor practice. In *Gissel,* the employer during a union organizing campaign pictured the company as in a precarious economic posture and "predicted" that the union, if it won the election, would strike for unreasonable demands, with the probable result that the plant that was the target of the union drive would have to be shut down and employees would be thrown out of work. The Court agreed with the Board that the employer had threatened, in none too veiled a fashion, to "throw employees out of work regardless of the economic realities." The Court held that although "an employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union" he must be considerably more cautious if he ventures to "make a prediction as to the precise effects he believes unionization will have on his company. In such a case * * * the prediction must be carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control * * *." 395 U.S. at 618, 89 S.Ct. at 1942.

*Gissel* accords with previous decisions in this Circuit condemning "a threat disguised as a prediction," N. L. R. B. v. Miller, 341 F.2d 870, 873 (1965), where the employer has control over whether dire consequences "predicted" will come to pass. Unless the employer can demonstrate objectively that such consequences are the likely result of economic necessity or the application of sound business practice to antecedent facts beyond the employer's control, the "prediction" inevitably takes on the character of a self-fulfilling prophecy and becomes the functional equivalent of a "threat of retaliation or force," unprotected by Section 8(c). See N. L. R. B. v. Yokell, 387 F.2d 751 (2d Cir. 1967).

The showing of "And Women Must Weep" undoubtedly illustrated the management's anti-union attitude more graphically than did its speeches and pamphlets. But a mere expression of anti-union sentiment by an employer is an exercise of free speech protected by at least Section 8(c) and most likely by the First Amendment. The film, in the context of its showing, cannot even be said to have implied a "prediction." A fairer characterization would be that by showing the film, the employer expressed an opinion that in the past local union officials have abused their power and called wild-cat strikes to the detriment of the union membership, and that similar abuses might accompany unionization in the future, particularly at Fort Plain. The Board does not assert that local unions have in fact never been corrupted and their power never abused to advance the selfish ends of their leaders. Thus, the film is a one-sided brief against unionism, devoid of significant rational content perhaps, but nonetheless not reasonably to be construed as threatening retaliation or force. Nowhere in the film does the employer or his representative appear or make any representation. The film, in short, may be characterized as an exposé of what happens to union members when dominated by ruthless and unthinking union officials.

Moreover, the union does not contend that it lacked the opportunity to

make its own case. In fact, it made use of the film, entitled "Anatomy of a Lie," designed to refute "And Women Must Weep." "Anatomy" apparently has been shown by other unions in the past to neutralize the effect of its anti-union counterpart. It is primarily the responsibility of employees, and not of the Board, to evaluate the merit of competing propaganda. "Congress did not intend the Board to act as a censor of the reasonableness of statements by either party to a labor controversy * * *." N. L. R. B. v. Golub Corp., 388 F.2d 921, 928–929 (2d Cir. 1967). See also N. L. R. B. v. S & H Grossinger's Inc., 372 F.2d 26 (2d Cir. 1967) (opinion by Hays, C. J.). The import of a threat of force by an employer with power to inflict severe economic injury on a disfavored employee lies largely in the manifest fact that such threats are unanswerable by the union. That is not the case here. For the same reason, the present case is distinguishable from International Union of Electrical, Radio and Machine Workers v. N. L. R. B., 289 F.2d 757, 762–763 (D.C. Cir. 1960), relied upon by the Board, where the court agreed with the Board that the employer violated Section 8(a) (1) by asserting "categorically" and without factual justification that two of the employer's biggest customers had determined not to do business with a union company "because of the fear of shortage of products due to strike." Although we express no view as to the merit of the decision in *I.U.E.*, categorical assertions of particular ° facts bearing directly on the probable consequences of a specific organizing effort are unanswerable by union appeals to the abstract values of collective action, and thus are more apt to distort employees' free choice based on a rational evaluation of competing views. See G.P.D., Inc. v. N. L. R. B., 406 F.2d 26 (6th Cir. 1969) (distinguishing the categorical assertions in I.U.E. from "prediction[s] of a probable consequence over which [the employer] had no con-

trol" ,and which were therefore protected by Section 8(c)).

For these reasons, we find ourselves in agreement with the two other Circuits that have previously considered the lawfulness of an employer's showing of the film "And Women Must Weep" and found no unfair labor practice, Southwire Co. v. N. L. R. B., 383 F.2d 235 (5th Cir. 1967); N. L. R. B. v. Hawthorn Co., 404 F.2d 1205 (8th Cir. 1969). The Eighth Circuit has reconsidered and reaffirmed its decision in *Hawthorn* following the Supreme Court's decision in *Gissell*, Kellwood Co., Ottenheimer Division v. N. L. R. B., 434 F.2d 1069 (1970).

### III.

Pursuant to an amended Direction of Election issued by the Board's regional office, a secret ballot was held on September 19, 1969, which the union lost by a vote of 68 to 20. Immediately after the ballots were counted, Vice President Reinhardt of Beaunit Corporation delivered the following speech to the Fort Plain plant employees:

(1) I am very glad to announce the results of the election. The company won the election by a score of 68 to 20. We appreciate your loyalty and have taken this as a vote of trust and confidence in the company.

(2) As we have told you before, so long as this union matter was pending, we were not able to make any changes with regard to wages or benefits; however, now that the union question is behind us, I am very happy to announce that effective Monday morning, September 22, there will be:

(a) 5 percent wage increase

(b) July Fourth paid holiday all year, over and above vacation pay

(c) a retirement program which will be fully explained to you by Mr. Drumm and Mr. Shillinglaw at a later date.

(d) Because of our group discussions, I am aware of the numerous

problems that need to be solved, and I can assure you we will diligently pursue a solution to these problems.

(3) We are very happy to be able to make this announcement. We are extremely glad to have this union thing behind us, and we appreciate your overwhelming support in the election.

(4) I can assure you you will never have a reason to regret keeping the union out of Fort Plain.

Thank you very much for your time.

On October 6, a Regional Director of the Board found merit in one of several objections to the election filed by the union and accordingly set the election aside and directed that a new election was to be held at a time to be designated. Further arrangements for the re-election have been deferred pending the disposition of the present proceeding. The ground for setting aside the first election was the employer's failure to comply with directions by the Director dated July 1 and August 26, 1969, to file a list with the names and addresses of all employees eligible to vote in the election, pursuant to Excelsior Underwear Inc., 156 N.L.R.B. 1236, modified by N. L. R. B. v. Wyman-Gordon Co., 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969). The lists were ordered to be filed by July 9 and September 3 according to the terms of the respective orders, but none were ever filed.

■ The Board affirmed without comment the Trial Examiner's conclusion that the company's extension of substantial new benefits on the day of its election victory was deliberately calculated to interfere with the re-election and hence violated Section 8(a) (1), N. L. R. B. v. Exchange Parts Co., 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964). The question on this review is not whether we would have interpreted the employer's intention as did the Board in the first instance, but whether the Board's resolution of this factual issue is supported by substantial evidence on the record considered as a whole, Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

The company relies upon several factual distinctions between this case and *Exchange Parts*. Primary among these is the circumstance that the announcement of benefits in this case was made after the election, not before as in *Exchange Parts*, and thus is similar to N. L. R. B. v. Ambox, Inc., 357 F.2d 138 (5th Cir. 1966), where the court found no unfair labor practice in the employer's post-election announcement of benefits. The company also argues that the decision to extend benefits was reached by Beaunit officials several months before the election and were at that time extended to other Beaunit plants, but not Fort Plain. According to undisputed testimony before the Trial Examiner, announcing the new benefits was delayed at Fort Plain pending the outcome of the election to avoid violating *Exchange Parts*. The upshot of the argument is that by ruling a post-election announcement to be illegal, the Board leaves employers with a Hobson's choice: an unfair labor practice will be found regardless of when benefits are announced, see N. L. R. B. v. Dorn's Transportation Co., 405 F.2d 706 (2d Cir. 1969).

But to accept the employer's argument would be to raise the single element of timing—whether an announcement came before or after an election—to an unrealistic per se status. The Company's intent is to be construed from the record as a whole. There was no apparent compelling business purpose for coupling the announcement of benefits, as did Reinhardt, with his victory speech, and thereby inevitably impressing employees with the idea that a union defeat spells more pay, more vacations, and higher pensions.

That impression was probably magnified here, where it appears that so generous a package was practically unprecedented, at least at the Fort Plain plant. One employee testified without contradiction that in her ten years at the plant, the company extended no wage increases

or other benefits except insofar as required by successive increases in the legally required minimum wage. Cf. Imco Container Co. of Harrisonburg v. N. L. R. B., 346. F.2d 178 (4th Cir. 1965). Also, the motives behind the company's delay of the announcement until after the election would take on an ambiguous hue at best, quite apart from the manner of the announcement, in view of the fact that the company's conduct made a union challenge to the validity of the election a certainty, and made a re-election almost as inevitable, by its refusal timely to supply the *Excelsior* list. See N. L. R. B. v. Ralph Printing and Lithographing Co., 379 F.2d 687 (8th Cir. 1967).

Were we to grant the petition to review under these circumstances, we would open the field for uninhibited evasion of *Exchange Parts*. That the employer might also have violated *Exchange Parts* had it announced the benefits prior to the September election does not make out a case that the employer was whipsawed by the Board's policy. As a result of the employer's own failure to comply with the Regional Director's directives, the dispute over representation was not settled by the September election. Moreover, any hardship that might be caused to employees had the company withheld announcing the benefits at the Fort Plain plant until after the re-election, could have been alleviated simply enough by the company making the benefits retroactive to September 19.

Finally, that the benefits were not selectively extended only to Fort Plain employees does not conclusively imply, or even suggest, that the Company's motives were innocent. The most that can be said is that if the opposite were true, that is, if a *selective* decision to improve the lot of the Fort Plain workers had been arrived at during the organizational campaign there, a finding of bad faith would have been very difficult to resist.

For the reasons stated, we enforce the Board's order,[2] except that we grant

2. On March 16, 1970, the Trial Examiner issued the following Recommended Order (footnotes omitted):

Respondent Luxuray of New York Division of Beaunit Corporation, its officers, agents, successors, and assigns shall:

1. Cease and desist from:

(a) Promulgating any illegal rule forbidding union solicitation by union adherents in the plant.

(b) Granting improved benefits, wage increases and paid holidays to its employees in order to interfere with their choice of bargaining representative or as an inducement to reject or refrain from activities in support of the Union.

(c) Showing the movie "And Women Must Weep" to its employees.

(d) In any like or similar manner interfering with, restraining or coercing its employees in the exercise of their right to self-organization, to form, join, or assist the Union, or any other labor organization, to bargain collectively through representatives of their own choosing and to engage in concerted activities for the purpose of collective bargaining or other mutual aid or protection or to refrain therefrom.

2. Take the following affirmative action which is necessary to effectuate the policies of the Act:

(a) Post at its plant in Fort Plain, New York, copies of the attached notice marked "Appendix." Copies of said notice, on forms provided by the Regional Director for Region 3, after being duly signed by Respondent's authorized representative, shall be posted by it immediately upon receipt thereof, and be maintained by it for 60 consecutive days thereafter, in conspicuous places, including all places where notices to employees are customarily posted. Reasonable steps shall be taken by it to insure that said notices are not altered, defaced, or covered by any other material.

(b) Notify the Regional Director for Region 3, in writing within 20 days from the receipt of this Decision what steps have been taken to comply herewith.

IT IS FURTHER RECOMMENDED that the complaint is dismissed insofar as it alleges unfair labor practices not hereinabove found.

The Order of the Board was issued August 25, 1970:

Pursuant to Section 10(c) of the National Labor Relations Act, as amended, the National Labor Relations Board adopts as its Order the Recommended Order of the Trial Examiner and hereby orders that the Respondent, Luxuray of New York Division of Beaunit Corpora-

the petition to review and deny enforcement of Paragraph 1(c) of the Board's order, and we direct that the second paragraph of the "Appendix" to the order ("Notice to Employees") be stricken.

WATERMAN, Circuit Judge (concurring in part and dissenting in part):

I would deny any enforcement of any portion whatever of the Board's order. I fully concur in my brother Kaufman's discussion of the film "And Women Must Weep" and hold with him that the showing of it under the circumstances under which it was shown was not a violation of the Act. The Union also utilized the silver screen and, on its part, treated those employees willing to be entertained to a showing of "The Anatomy of a Lie." [1]

Both of my brothers vote to enforce the remainder of the Board's order on the ground that the Board properly found, as its Examiner recommended, that the grant of economic benefits after the Union had been soundly defeated at the Board-supervised representation election was a violation of Section 8(a) (1), and that the Board properly ordered, contrary to its Examiner's recommendation, that the single instance of surveillance (admitted by the employer to be a violation) warrants a cease and desist order.

Inasmuch as a second election was not clearly imminent at the time that the increase in benefits was announced by Luxuray, I cannot find a violation of Section 8(a) (1) in the timing of that announcement. Indeed, to so find a violation appears to ignore the prime interests of the employees. It is undisputed that the employer here had put into effect these same increases at other plants where unionization activity did not proscribe it, and that the delay in announcing the increases to the Fort Plain employees was in all likelihood motivated by a desire to avoid a charge of an unfair labor practice under the doctrine of NLRB v. Exchange Parts Co., 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964). To construe the *Exchange Parts* doctrine, as the Examiner appears to do, to require the employer to refrain from announcing and implementing pay increases until after all aspects of a union organizational campaign have been resolved, a process which often consumes years, twists the *Exchange Parts* doctrine into an instrument to punish employees for union organization. The doctrine should not bar grants of economic benefits after the employees have had a full opportunity to ballot secretly on whether they wish unionization. Quite obviously the purposes of the Act are not furthered by finding a violation of Section 8(a) (1) in this context.[2]

tion, Fort Plain, New York, its officers, agents, successors, and assigns, shall take the action set forth in the Trial Examiner's Recommended Order, with the following modifications:

1. Delete paragraph 1(a) and substitute the following:
(a) Engaging in surveillance of the union activities of its employees.

2. Delete the third paragraph of the "Appendix" and substitute the following:
WE WILL NOT engage in surveillance of the union activities of our employees.

1. See Appendix at pages 152 and 164.

2. As stated in Part III of the lead opinion, the votes were counted on September 19, and the challenged announcement was made immediately after the count. The objections to the election were filed one week later, on September 26, and the September 19 election was not set aside until October 6. In view of the 68–20 vote, a vote found at the Board level not to have been unfairly influenced by employer activity except by the showing of "And Women Must Weep" (which we hold was not an unfair labor practice), it is unreasonable to suppose that the increased benefits were offered to affect unfairly a second election.

In NLRB v. Ambox, 357 F.2d 138 (5 Cir. 1966), the Fifth Circuit subsequent to *Exchange Parts*, held that an employer's post-election grant of retroactive benefits not made dependent upon the outcome of an election proceeding where objections were still to be cleared up was not an unfair labor practice. This approach seems to me to be more sensible than the approach taken by the Board here. Here the increases in benefits were not made contingent on the outcome of any possible second election, and here the

Moreover, I fail to see how the single instance of surveillance by the employer's supervisors, a surveillance which the employees never knew about, which was never followed up or pursued by the employer, and which did not interfere with the organizational activity of the employees, warrants the issuance of a court cease and desist injunction order. Of course, there would be interference with employees' organizational rights if any employee were aware of the surveillance, or if the employer used the information gained in such surveillance to punish union organizers or to influence employees against unionization; but these factors justifying a cease and desist order are totally absent here. Admittedly, Luxuray does not contest the Board's finding that this surveillance was a violation of the Act, even though I seriously question that it really was; Luxuray only argues that a remedial order is not warranted. In this posture, we cannot properly reverse the Board's finding of a violation on this issue, but even if a violation is admitted, I believe that we should approach the issuance of a remedial order as the Examiner would approach it and that we should exercise our discretion to deny the Board's request for relief on the grounds that the facts indicate that this violation was *de minimis*.

HAYS, Circuit Judge (concurring in part, dissenting in part):

I concur in the opinion of Judge Kaufman with respect to points I and III but dissent from the majority's determination that the showing of the film "And Women Must Weep" was not a violation of Section 8(a)(1) of the Act.

We are not called upon to decide whether the showing of this film would interfere with, restrain or coerce United States circuit judges. (See NLRB v. Golub Corporation, 388 F.2d 921 (2d

Cir. 1967) (dissenting opinion)). The question is what effect the film would be likely to have on the employees of Luxuray. In answering this question this Court is required to give great weight to the expertise of the Labor Board. The Board is in a far better position than we are to judge what effect the film would have. "[A] reviewing court must recognize the Board's competence in the first instance to judge the impact of utterances made in the context of the employer-employee relationship * * *." NLRB v. Gissel Packing Co., 395 U.S. 575, 620, 89 S.Ct. 1918, 1943, 23 L.Ed.2d 547 (1969).

*Gissel* holds that despite the protection of Section 8(c), the Board can properly find that an employer has committed an unfair labor practice, not only if he makes overt threats, but also if he makes a "prediction" with respect to the effect of the actions of a third party when the prediction is not "carefully phrased on the basis of objective fact to convey an employer's belief as to demonstrably probable consequences beyond his control * * *." *Id.* at 618, 89 S.Ct. at 1942. As the First Circuit has recently said, *Gissel* deals with the situation where "consequences not within the control of the employer might be described as probable or likely, when in fact there was no objective evidence of any such likelihood. This would not be a retaliatory threat, but it would be an improper threat nonetheless." NLRB v. C. J. Pearson Co., 420 F.2d 695 (1st Cir. 1969). "And Women Must Weep" does not deal with "objective fact" or "demonstrably probable consequences." It contains grossly melodramatic distortions which the employer not only did not attempt to verify, but which he magnified by telling the employees that the incidents pictured in the film were "actually true" and that what "happened in that

---

increases were put into effect contemporaneously with their announcement. The promise of retroactive pay increases pending resolution of union objections to the conduct of an election is clearly more of

"a fist inside the velvet glove," Exchange Parts, *supra*, 375 U.S. at 409–410, 84 S.Ct. at 460, than an increase becoming effective at the time of the announcement thereof.

movie could happen to us people, our community, our friends."

The Board seems to me to have been acting well within its powers when it found that by showing this film to a captive audience of people who were economically dependent on the employer and who had a "necessary tendency * * * to pick up intended implications of the [employer] that might be more readily dismissed by a more disinterested ear," NLRB v. Gissel Packing Co., *supra*, 395 U.S. at 617, 89 S.Ct. at 1942, the employer was in fact communicating a threat of retaliatory action. The Board's view that the film, in the employer-employee context, implies that the company will by *its* behavior, act in a way that will bring about the type of confrontation depicted there, is by no means so unsupportable as to justify setting aside the Board's order.

An employer can easily avoid committing this type of unfair labor practice. All he has to do is to "avoid coercive speech simply by avoiding conscious overstatements he has reason to believe will mislead his employees." NLRB v. Gissel Packing Co., *supra* at 620, 89 S.Ct. at 1943.

I would enforce the Board's order in full.