[Civ. No. 16995. Fourth Dist., Div. One. June 3, 1980.]

PROHOROFF POULTRY FARMS, Petitioner, v.
AGRICULTURAL LABOR RELATIONS BOARD, Respondent;
UNITED FARM WORKERS OF AMERICA, AFL-CIO, Real Party
in Interest.

COUNSEL

Gray, Cary, Ames & Frye, James K. Smith and John M. Phelps for Petitioner.

Marvin J. Brenner, Manuel M. Medeiros, Ellen Lake and E. Brody Manders for Respondent.

Jerome Cohen, Sanford N. Nathan, Tom Dalzell, Deborah Wiener Peyton, W. Daniel Boone, Ellen Greenstone, Glenn Rothner, E. Michael Heumann, Linton Joaquin, Marco E. Lopez, Carlos M. Alcalá, Francis E. Fernandez, Carmen C. Flores and Dianna Lyons for Real Party in Interest.

OPINION

**BROWN (Gerald), P. J.**—Petitioner is a poultry farm operator located near San Marcos deriving its principal revenue from egg production. It was charged with unfair labor practices committed in September and October 1975, when the United Farm Workers (UFW) was organizing petitioner's employees in advance of the election of October 24, 1975, won by no union.

The charges are petitioner tendered a number of benefits to its employees, ranging from an improved health plan to a chicken dinner at

company expense, in order to influence the employees' vote. Also charged are impermissible interrogations of employees Jesus Gonzales, Sr., and Arnulfo Jiminez, regarding their union sentiments, and promises to Jiminez of special favors if he did not support the union.

The board found unfair labor practices occurred: benefits offered shortly before the union election, and impermissible interrogations of employees Jiminez and Gonzales. In addition, the board found petitioner impermissibly circulated threats of possible union violence to discourage a union vote. This unfair labor practice was not charged in the complaint. The company brochure containing the supposed threats was entered in evidence on other charges to establish an antiunion attitude.

The final order required distribution, mailing and posting of notice of the decision, and also included a cease and desist order. The board mandated one-hour access on company time of an unspecified number of union organizers, premising the need for such access on the egregious nature of the "threat" literature.

Petitioner is particularly concerned over the access order. It alleges Prohoroff is a relatively urban operation, more like a factory than a ranch, so the need for on-premises access is much less than in the case of a ranch where the workers either live there or commute to far removed inaccessible locations such as homes without telephones in Tijuana. It further argues the poultry/egg business is a sensitive operation, easily disrupted by outside persons who may transmit poultry diseases, cause stress and shock to the chickens, and otherwise disrupt operations. It also argues the evidence in the record does not justify the strong medicine of unlimited union access. Petitioner also attacks the practice of finding unfair labor practices which were never charged but were "litigated" in the sense the evidence came into the record and further condemns as punitive a remedy permitting unlimited union access to employer premises without compelling justification.

Specifically the board order provides: (1) Petitioner shall cease and desist from enumerated unfair labor practices; (2) Petitioner shall distribute, mail, post for 90 days, and have read by a board agent, in appropriate languages, notice of apology and promise to desist; (3) The UFW shall be granted space on the employer bulletin boards for one year; (4) During the next organizational period, the union shall have one-hour access on company time, number of organizers not specified.

(This remedy is in addition to the regulation access already afforded the union under board regulations.)

The facts held to constitute unfair labor practices are:

*Impermissible Benefits and Threats*

The board found a benefits plan granted in September 1975 to be a significant and unprecedented change of working conditions, with no persuasive reason offered to justify the timing, just in advance of the union election. The board noted John Prohoroff, Jr., (John) told the employees "the union did not give benefits to its members. Benefits come only from me, from the business." The board characterized that statement as a classic tendering of employer benefits by a fist in a velvet glove. (*Labor Board* v. *Parts Co.* (1964) 375 U.S. 405, 409 [11 L.Ed.2d 435, 438, 84 S.Ct. 457].)

The employee benefits were conferred between September 19 and September 26, 1975, about a month before the election which took place on October 24. The history of the events before the election is: The Agricultural Labor Relations Act (Act) went into effect on August 28, 1975. John admitted knowledge of its enactment through trade publications suggesting he prepare for union activity. On September 18, 1975, he and other management personnel attended a meeting of the San Diego Employer's Association. According to former personnel manager Kolesnikov, at the meeting John said, "We will be shortly confronted with union elections and we want advice as to how we best can keep our ranch union free." At the meeting, benefits paid employees in local industries were discussed. The next day, September 19, the first of a series of employee meetings was held at Prohoroff. The employees were promised health insurance, paid holidays, overtime for Sunday work, wage review twice a year. Raises were granted September 21 and paid September 26. In egg production, the largest operation at Prohoroff, this was the first wage increase since 1969. Further, the employer actively distributed through the work force antiunion literature indicating possibility of violence and empty promises resulting from unionization. At least two employees, Gonzales and Jiminez, were asked why they supported the union and were told they would get more benefits if there was no union. At a company meeting within 24 hours of the election, John asked for a no-union vote and distributed newspaper clippings about union violence elsewhere and also a brochure showing one man strangling another and captioned (in Spanish): "Violence among

the pickets; don't let this happen at Prohoroff." Also, two days earlier, October 22, the company gave a dinner for the work force at the Red Barn Restaurant where antiunion literature was distributed. Management employee Greydon Koellman went to the homes of employees who lived in company housing days before the election, gave bags of inexpensive candy to their children and asked them about the union in a "friendly" manner. Just before the opening of the polls on election day, John gave a strong antiunion speech indicating the UFW is only for "stoop labor" and if the Prohoroff employees were to join they would be sent out to the farms to pick instead of keeping their skilled egg production jobs. Also, they might lose their company housing in the event of a strike because their homes would be behind the picket lines.

The employer's activities under scrutiny were a deliberate attempt to keep the union out. The issue of law is whether the tactics described above are unfair labor practices because they tend to coerce the employees in the exercise of protected rights of self-organization, or whether they are protected under the First and Fourteenth Amendments within the employer's free speech rights to express his antiunion attitude. The controlling statute is Labor Code section 1155, modeled verbatim on 29 United States Code Annotated section 158(c), providing the employer may compete against the union and may express his opposition to it provided his actions contain no "threat of reprisal or force, or promise of benefit." The classic case under NLRB precedent is *NLRB* v. *Gissel Packing Co.* (1969) 395 U.S. 575, 616-618 [23 L.Ed.2d 547, 579-580, 89 S.Ct. 1918, 1941-1943]). "[A]n employer's rights cannot outweigh the equal rights of the employees to associate freely,...And any balancing of those rights must take into account the economic dependence of the employees on their employers, and the necessary tendency of the former, because of that relationship, to pick up intended implications of the latter that might be more readily dismissed by a more disinterested ear...what is basically at stake is the establishment of a non-permanent, limited relationship between the employer, his economically dependent employee and his union agent, not the election of legislators or the enactment of legislation whereby that relationship is ultimately defined and where the independent voter may be freer to listen more objectively and employers as a class freer to talk." (395 U.S. at pp. 617-618 [23 L.Ed.2d at p. 580, 89 S.Ct. at p. 1942].) Limitations on the employer's free speech rights are greater in the context of "a nascent union organizational drive, where employers must be careful in waging their anti-union campaign." (*NLRB* v. *Gissel Packing Co., supra*, 395 U.S. at p. 616 [23 L.Ed.2d at p. 579, 89

S.Ct. at p. 1941].) The principal issue in this case is the application of these principles to the employer's conduct in campaigning against the union.

*Interrogations*

The board found impermissible interrogations in (1) a series of conversations between John and employee Jesus Gonzales; and (2) a conversation between supervisor Rogelio Garcia and employee Jiminez, who was a relative of Garcia as well as a subordinate employee. Taking the second of these first, the board found Garcia promised Jiminez if he would give up his union support, Garcia would get more money and a better job for Jiminez with more status, and would help him should the union go on strike. Garcia told Jiminez to let him know if he changed his mind and decided to vote "no union" so the "boss could count on his vote."

The conversations between John and Gonzales were likewise friendly, as testified by employee and supervisor alike. As Gonzales put it, "[I]t was a very friendly conversation. He was just inviting me to cooperate with management. And I told him that I could not accept that, that I was for the union and that's the way I continued." Although the exact words of the conversations cannot be ascertained from the different accounts given by John and by Gonzales, it seems John essentially attempted to persuade Gonzales to vote no-union because "I feel that I can do a much better job managing our affairs if I can work between you and me, personally, directly, like we have over the years, without an outside party between us. On the election, I would like to ask you to please vote for no union . . ." Gonzales said John promised him more benefits if he voted no-union and stated John was asking him not to vote for the union, but could not recollect exactly what had been said to him. He attempted to rely on a declaration he had formerly given to a board investigator which said only John has asked Gonzales to "go on their side" but he "refused to give up my union loyalties."

In addition to the foregoing direct evidence of charged incidents of coercive interrogation, the board considered evidence of threats which were litigated at the hearing as *"background"* for the charges of unfair labor practices framed in the complaint. These threats were made by persons named in the complaint and were introduced without objection through testimony and exhibits offered by all three parties. Thus the issues were fully litigated. The threats were made in one instance through

one of the employer's supervisors and in other instances through leaflets and speeches of the employer.

The leaflets in evidence are entitled "Someone was Shot," "Attacks," and "Fights and Beatings." These consisted of copies of newspaper stories of violent labor strikes along with Spanish translations. The newspaper clippings are not dated and at the bottom of these leaflets, which describe beatings with lead pipes, at least two separate shootings, and more attacks with pipes, clubs, belts, tire irons and machetes, appears in large printing the slogan, "VOTE NO, SO THAT THIS WILL NOT HAPPEN AT THE PROHOROFF RANCH."

The message these clippings carried was reinforced in a speech given by John on the day before the election. He told his employees: "The newspapers are filled with the horrible stories of what can and does occur when the UFW strikes. . . .People have been shot! People have been beat up! People have been killed!

"Your 'No' vote would insure that this will not and could not occur to you and your family." At this point in the speech, company officials distributed posters to the employees depicting one man strangling another. The poster says in Spanish: "Violence on the Picket Line Vote 'No' So that this will not happen on the Prohoroff Ranch."

Letters to the employees, dated three days before the election, say: "The newspapers are full of accounts of violence when the farm and the UFW aren't in agreement." These letters and the employer's speech also conveyed to employees the probability they would lose company housing if the union should come in.

Further, it is undisputed supervisor Roberto Jiminez threatened employee Jesus Gonzales, Jr., with the loss of jobs through replacement by machines if the employees chose a union.

Interrogating employees to determine if they are sympathetic to or members of a union may violate the Labor Code because the natural tendency of interrogation is "to instill in the minds of employees fear of discrimination on the basis of the information the employer has obtained." (*National Labor Relations Bd.* v. *West Coast Casket Co.* (9th Cir. 1953) 205 F.2d 902, 904.) Such questioning is inherently coercive. (*P.B. and S. Chemical Co.* (1976) 224 NLRB 1.) ■ Although interrogation may not be unlawful, if it is sufficiently isolated it is for the board to consider the surrounding circumstances in order to determine

whether a violation has occurred. (*Strukness Construction Co.* (1967) 165 NLRB 1062; *Blue Flash Express, Inc.* (1954) 109 NLRB 591.)

The questions here presented to the board were of such nature as to call for its special expertise. (*Universal Camera Corp.* v. *Labor Bd.* (1951) 340 U.S. 474, 488 [95 L.Ed. 456, 467, 71 S.Ct. 456].)

■ The board's finding of threats of violent strikes, loss of jobs and company housing as additional violations of section 1153, subdivision (a), is supported by overwhelming evidence in the record.

*Benefits*

■ The board order finding impermissible extension of benefits shall stand, because of the suspicious timing of the benefits, the factual nature of the issue whether such extension was coercive under the circumstances, and the special deference to be accorded the expertise of the board in this area. (See, e.g., *Labor Board* v. *Parts Co., supra*, 375 U.S. 405; *Luxuray of N.Y., Div. of Beaunit Corp.* v. *National Lab. Rel. Bd.* (2d Cir. 1971) 447 F.2d 112, 118-119.)

*The Remedy*

In both *Sunnyside Nurseries, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 93 Cal.App.3d 922 [156 Cal.Rptr. 152], and *Pandol & Sons* v. *Agricultural Labor Relations Bd.* (1979) 98 Cal.App.3d 580 [159 Cal.Rptr. 584], the courts struck down a board remedy covering a one-to-four-month period allowing expanded access by unlimited numbers of union organizers to employees three hours a day. Here we have a remedy allowing a one-time-only union access for a one-hour meeting with employees, also unlimited as to number of organizers. Both *Sunnyside* and *Pandol* struck down the remedy there used because of the inherent potential for violence, for an out-of-control situation resulting from unlimited numbers of union people on the premises. That potential is also inherent in the remedy used here, but to a lesser degree.

The board in defense of its remedy cites not only the normal cases mandating deference to board discretion in fashioning suitable remedies (e.g., *Phelps Dodge Corp.* v. *Labor Board* (1941) 313 U.S. 177, 194 [85 L.Ed. 1271, 1283, 61 S.Ct. 845, 133 A.L.R. 1217]), but also its special regulations for the poultry industry designed to prevent transmission of animal disease, product contamination, and animal stress.

(Cal. Admin. Code, tit. 8, § 20901, subd. (a)(2).) The board order specifically refers to that regulation.

■ We believe it would have been preferable for the board to specify the number of organizers to be given access. Precise rules make for a controlled situation and minimize unnecessary friction between employer and union. There is no prejudice to the union in being limited to a stated number of on-premise organizers.

The cause is remanded to the board for redrafting of its access order, which shall specify the number of organizers to have access to petitioner's premises. Each party shall bear its own costs.

Staniforth, J., concurred.

COLOGNE, J.—I concur in the result reached by the majority.

While I am satisfied the evidence does not support a finding the speeches or conversations John Prohoroff, Jr., had with employees were in violation of Labor Code section 1153 (see *N.L.R.B.* v. *M & W Marine Ways, Inc.* (5th Cir. 1969) 411 F.2d 1070; *N.L.R.B.* v. *Ralph Printing and Lithographing Company* (8th Cir. 1967) 379 F.2d 687) and the distribution of leaflets by Prohoroff was protected by free speech (see *Luxuray of N.Y., Div. of Beaunit Corp.* v. *National Lab. Rel. Bd.* (2d Cir. 1971) 447 F.2d 112; *N.L.R.B.* v. *Hawthorn Company* (8th Cir. 1969) 404 F.2d 1205; *Southwire Company* v. *N.L.R.B.* (5th Cir. 1967) 383 F.2d 235), there was evidence, tenuous as it may appear from the record, supervisor Roberto Jiminez threatened employees with loss of jobs if the employees chose a union and Victor Kolesnikov promised extra benefits if they voted "no union." Whether the specific language of each of these statements amounts to an act in violation of the Agricultural Labor Relations Act (Lab. Code, § 1153) is a factual question and the board's determination in this regard is conclusive (Lab. Code, § 1160.8; *Tex-Cal Land Management, Inc.* v. *Agricultural Labor Relations Bd.* (1979) 24 Cal.3d 335 [156 Cal.Rptr. 1, 595 P.2d 579]). On that basis alone I am constrained to uphold the decision of the board on the violation by Prohoroff of Labor Code section 1153.

I concur in the opinion of the majority as it relates to access.

Petitioner's application for a hearing by the Supreme Court was denied July 30, 1980. Bird, C. J., did not participate therein.