225 F.3d 248 (2nd Cir. 2000)
 Sheridan Manor Nursing Home, Inc., Petitioner-Cross-Respondent,
v.
National Labor Relations Board, Respondent-Cross-Petitioner,
Communications Workers of America, Intervenor.
 Docket Nos. 99-4190(L) and 99-4219(XAP)
August Term, 1999
 United States Court of Appeals
For the Second Circuit
 Argued: May 24, 2000
Decided: August 21, 2000
 
 Petition for review of order of the National Labor Relations Board directing petitioner to cease and desist from conduct found violative of §§ 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. § 151, 151(a)(1) and (5), recognize the Communication Workers of America, and bargain with the union upon request. The National Labor Relations Board filed a cross-application for enforcement of the order.
 Petition denied, cross-application granted.
 THOMAS V. WALSH, Jackson, Lewis, Schnitzler & Krupman, White Plains, NY, for Petitioner Sheridan Manor Nursing Home, Inc.
 USHA DHEENAN, National Labor Relations Board (David Habenstreit, of counsel), Washington, DC, for Respondent National Labor Relations Board.
 JONATHAN G. JOHNSEN, Lipsitz, Green, Fahringer, Roll, Salisbury & Cambria, LLP, Buffalo, NY, for Intervenor Communications Workers of America.
 Before: LEVAL, KATZMANN, Circuit Judges, and MURTHA, District Judge.*
 KATZMANN, Circuit Judge:
 
 
 1
 Sheridan Manor Nursing Home, Inc. ("Sheridan") petitions for review of an order of the National Labor Relations Board ("NLRB" or "Board") finding that Sheridan violated §§ 8(a)(1) and (5) of the National Labor Relations Act ("NLRA" or "Act")), 29 U.S.C. § 151, 158(a)(1) and (5), by soliciting employee opposition to the collective bargaining agreement ("CBA") ratification procedure of intervenor Communication Workers of America ("Union") and withdrawing recognition of the Union. The order directed Sheridan to cease and desist from this conduct, recognize the Union, and bargain upon request. The NLRB makes a cross-application for enforcement of the order, and the Union intervenes on the NLRB's behalf. For the reasons stated below, we dismiss Sheridan's petition and grant the Board's cross-application.
 
 BACKGROUND
 1. Factual Background
 
 2
 The essential facts are not in dispute except where noted. On or about January 4, 1994, Local 1168 of the Union was certified as the collective bargaining representative of a unit of service and maintenance employees working for Sheridan. On January 5, 1995, after months of bargaining -- and just after the Union's one-year certification bar had expired[1] -- the Union and Sheridan reached a tentative CBA, which was to remain tentative until ratified by the unit. The CBA contained a "maintenance of membership" clause which stated:
 
 
 3
 All employees who choose to become members of the Union on the effective date of this Agreement shall, as a condition of employment, remain members for the term of this Agreement. All employees who wish to join the Union and do so after the effective date of this Agreement, shall, as a condition of employment, remain members of the Union for the term of this Agreement.
 
 
 4
 In other words, under the tentative CBA, bargaining unit employees were not required to join the Union.
 
 
 5
 Sheridan alleges, and the Union disputes, that during the final negotiating session on January 5, 1995 the Union announced for the first time that the ratification vote on the tentative CBA would be open only to bargaining unit employees who were Union members. The following day, the Union distributed a memorandum to all bargaining unit employees announcing a membership meeting on January 12th for the purpose of reviewing and voting on the tentative CBA. The memorandum stated that "only members of the [U]nion will be admitted to the membership meeting and be allowed to vote."
 
 
 6
 That same day, approximately two days after the Union's one-year certification bar had expired, Sheridan distributed a memorandum ("Memo") of its own criticizing the exclusion of non-Union members from the ratification process as "pos[ing] a threat to your individual freedom." The Memo noted the "maintenance of membership" clause, and stated:
 
 
 7
 The Union has now advised us that they will only permit those employees of Sheridan Manor who have already signed a membership card to the Union or who sign such a membership card at the meeting on January 12, 1995 to vote on [Sheridan's] proposal. We think this tactic by the Union is unfair and violates your freedom of choice. The Union is really telling you that you cannot vote on a contract that will cover you unless you agree to become a member before the vote. If you have signed a membership card or if you sign one in order to get the right to vote, the Union may then say that you are a member and that you must continue to pay dues to the Union during the life of the contract. This would be wrong since it is an obvious effort to circumvent your right of free choice that we fought so hard for so long to preserve. You, of course, have the right to join the Union and sign a membership card if that is your desire and as long as you understand that you would be required to pay dues for the next two years. If, however, you are opposed to paying dues to the Union you should object now and refuse to sign a membership card, if you have not already done so. There is currently no requirement that any employee of Sheridan Manor become a member or pay dues to the Union. You have a right to resign from the Union if you are already a member and you also have a right to refuse to sign a membership card if the Union attempts to require you to sign one in order to vote on the contract.
 
 
 8
 Also that same day, the Union received a list of bargaining unit employees that it had requested from Sheridan on January 5th. According to Union President Debora M. Hayes, the list contained 130 or 134 names.
 
 
 9
 In the days that followed, the Union received letters from fourteen Sheridan employees resigning from the Union, including four who had never joined. One employee who was upset about the Union's ratification procedure circulated a decertification petition among the bargaining unit and collected sixty signatures, along with a notation that another employee who was out sick, and thus could not sign the petition, did not want a union. The petition was submitted to Sheridan on January 12, 1995, the day of the Union's scheduled ratification vote.
 
 
 10
 Upon receiving the petition, which did not constitute a majority of the 130 or 134-member bargaining unit represented on the list prepared by Sheridan six days earlier, Sheridan conducted a review and determined that the bargaining unit actually contained only 113 employees. Concluding after this review that the Union no longer enjoyed the support of a majority of the bargaining unit, Sheridan notified the Union approximately one and a half hours prior to the scheduled CBA meeting that it was withdrawing recognition.
 
 
 11
 Nevertheless, the Union proceeded with the meeting, which only ten or eleven Union members attended. All voted to ratify the tentative CBA. When the CBA was presented to Sheridan for execution, Sheridan declined to sign it.
 
 2. Procedural Background
 
 12
 The Union filed three unfair labor practice charges with the NLRB against Sheridan. A consolidated trial was held before Administrative Law Judge Howard Edelman. In a decision dated December 7, 1995, ALJ Edelman found no violations of law and recommended dismissal of the charges against the Sheridan in their entirety.
 
 
 13
 On review, a divided three-member panel of the Board found that the Memo constituted an unfair labor practice under § 8(a)(1) of the Act. While recognizing that § 8(c) of the Act protects an employer's right freely to express and disseminate its views and opinions provided such expressions contain no threat of reprisal or promise of benefit, the Board held that Sheridan violated § 8(a)(1) by "'engag[ing] in conduct which . . . tend[ed] to interfere with the free exercise of employee rights under the Act.'" Sheridan Manor Nursing Home, Inc., 329 NLRB No. 51, 1999 WL 812241, at *2 (Sept. 30, 1999) (quoting American Freightways Co., 124 NLRB 146, 147 (1959)). In particular, the Board concluded that Sheridan "interjected itself into an internal union matter" -- namely, the contract ratification process -- by issuing a Memo that, among other things, encouraged employees to "'object now and refuse to sign a membership card.'" Id. at *3.
 
 
 14
 The Board further held that Sheridan violated §§ 8(a)(5) and 8(a)(1) by withdrawing recognition from the Union after receiving the employees' decertification petition. See id. at *4. It held that the Sheridan could not claim a good faith belief that the Union lacked majority support because the employees' decertification petition was tainted by Sheridan's unlawful Memo. See id. Accordingly, the Board ordered Sheridan to cease and desist from further unfair labor practices, to recognize the Union as the unit's bargaining representative, and to bargain with the Union upon request. See id. at *5.
 
 
 15
 The dissent argued that the Memo was "simply an expression of a point of view," id. at *8, and was thus protected speech under § 8(c) of the Act rather than an unfair labor practice under § 8(a)(1). Accordingly, the dissent went on to claim that because the Memo was not unlawful, the decertification petition was not tainted and Sheridan's withdrawal of recognition was valid. See id. at *8-9.
 
 
 16
 Sheridan's petition, and the NLRB's cross-application for enforcement of the order, followed.
 
 DISCUSSION
 1. Standard of Review
 
 17
 Our first task is to determine the appropriate standard of review. The Board maintains that its decision should be upheld if it is supported by substantial evidence. See NLRB v. Windsor Castle Health Care Facilities, Inc., 13 F.3d 619, 623 (2d Cir. 1994). Sheridan argues that the Board's decision must be reviewed under a heightened standard because it involves a mixed question of fact and law and because the Board's decision was not unanimous. See National Maritime Union of America v. NLRB, 867 F.2d 767, 772 (2d Cir. 1989) (involving mixed question of fact and law and stating that "[c]ourts are less inclined to show deference for the judgment . . . when the deciding members of the agency itself hold differing opinions on the matter in question.").
 
 
 18
 Neither the Board nor Sheridan is wholly correct. It is, of course, true that "[w]e must enforce the Board's order if the Board's conclusion has a reasonable basis in law, and if its factual findings are supported by substantial evidence on the record as a whole." Windsor Castle, 13 F.3d at 623 (citation omitted). The substantial evidence standard, however, applies only to the Board's factual findings. See id; Kinney Drugs, Inc. v. NLRB, 74 F.3d 1419, 1427 (2d Cir. 1996). The relevant factual findings in this case are not in dispute. Instead, the issues here are mixed questions of fact and law, which we review de novo. See Beverly Enters., Inc. v. NLRB, 139 F.3d 135, 140 (2d Cir. 1998). Thus, Sheridan's proposed standard of review is correct as a general matter. However, Sheridan overlooks that in undertaking a de novo review in cases presenting mixed questions of fact and law we defer to the Board's decision when there appears to be more than one reasonable resolution and the Board has adopted one of these. See id.; AT & T v. NLRB, 67 F.3d 446, 451 (2d Cir. 1995).
 
 2. Analysis
 A. The Memo
 
 19
 Sheridan argues that the Memo was protected speech under § 8(c) of the Act and, accordingly, that the Board erred when it concluded that the Memo violated § 8(a)(1). Section 8(c) provides:
 
 
 20
 The expressing of any views, arguments or opinions, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or promise of benefit.
 
 
 21
 29 U.S.C. § 158(c).
 
 
 22
 According to Sheridan, the NLRB panel majority erred when it concluded that the Memo encouraged employees to disrupt the union's ratification procedures and thereby "unlawfully interfered in the relationship between the employees and their representative, in violation of Section 8(a)(1)." Sheridan Manor, 1999 WL 812241, at *3. Sheridan contends that the Memo was nothing more than an expression of its views and opinions on the Union's denial of voting rights to non-members. It notes that phrases such as "I believe" and "We think" are scattered throughout the Memo, which also acknowledges the right of employees to join the Union. Sheridan further argues that the Memo contains no "threat of reprisal" or "promise of benefit." If Sheridan is correct that the Memo is merely an expression of views and opinions setting forth no threats or promises, the Memo was protected employer speech under § 8(c) and cannot be held to constitute an unfair labor practice under § 8(a)(1).
 
 
 23
 As noted, we defer to the Board in cases involving mixed questions of fact and law that allow for more than one reasonable resolution. See Beverly Enters., 139 F.3d at 140. The instant matter, which presents a close question, is such a case. Under the circumstances of this case, we defer to the Board's conclusion that by using phrases such as "you should object now and refuse to sign a membership card, if you have not already done so" Sheridan:
 
 
 24
 went beyond merely providing information to its employees or expressing an opinion, but rather disrupted the Union's internal ratification procedures by soliciting and encouraging employees to refuse to comply with the lawful requirement that they be members of the Union in order to vote on the contract
 
 
 25
 . . . .
 
 
 26
 Sheridan Manor, 1999 WL 812241, at *3. The Board's conclusion that Sheridan's encouragement of employee objection and action was conduct "beyond" mere expression of opinion and, thus, beyond the protection of § 8(c), was a reasonable one under the circumstances of this case, even if the Board's application of fact to law was one over which reasonable people might disagree. See Wire Prods. Mfg. Corp., 329 NLRB No. 23, 1999 WL 740883, at *1 (Sept. 17, 1999) (finding § 8(a)(1) violation when employer encouraged employees to join union, vote against ratification of contract, and revoke membership after voting).
 
 
 27
 In addition to affirming the judgment of the NLRB panel majority, we note that the Board's brief cites our 1969 opinion in NLRB v. General Elec. Co., 418 F.2d 736, 760 (2d Cir. 1969), for the proposition that "[t]he evil at which . . . section [8(c)] was aimed was the alleged practice of the Board in inferring the existence of an unfair labor practice from a totally unrelated speech or opinion delivered by an employer." (emphasis added). The Board thus argues that § 8(c) protects only speech that is unrelated to the unfair labor practice charged and, thus, does not protect Sheridan in this case because the Memo and the unfair labor practice were one and the same. The NLRB panel opinion neither cited General Electric nor relied on this general line of reasoning.
 
 
 28
 While we make no ruling on the matter, we have doubts as to whether the Board's reading of General Electric accurately reflects the current law of this Circuit. In NLRB v. Gissel Packing Co., 395 U.S. 575, 618 (1969), the Supreme Court stated that "an employer is free to communicate to his employees any of his general views about unionism or any of his specific views about a particular union, so long as the communications do not contain a 'threat of reprisal or force or promise of benefit.'" (emphasis added) (citing § 8(c)). Gissel, which was decided four months prior to General Electric, was not mentioned in the General Electric panel's discussion of § 8(c). In addition, subsequent decisions of this Court finding employer speech protected under § 8(c) despite being related to the unfair labor practices charged are at odds with the reading of General Electric that the Board now urges. See, e.g., Kinney Drugs, 74 F.3d at 1429 (citing Gissel and holding that employer's statement during union organizational drive "that it might be cheaper to replace the warehouse functions with an outside trucking firm if the warehouse employees formed a union" was protected speech); NLRB v. Pratt & Whitney Aircraft Div., 789 F.2d 121, 134-35 (2d Cir. 1986) (citing Gissel and holding that employer's communication to employees during collective bargaining with union was protected speech that did not amount to direct dealing); Luxuray v. NLRB, 447 F.2d 112, 115-17 (2d Cir. 1971) (holding that exhibition of anti-union film expressing negative opinion of past local unions and speculating that similar abuses might accompany future unionization was protected speech under § 8(c)). Gissel, and our holdings in Kinney Drugs, Pratt & Whitney and Luxuray, do not appear to contemplate the distinction argued by the Board in reliance on the General Electric language cited.
 
 B. Withdrawal of recognition
 
 29
 Sheridan contends that the employees' decertification petition was not tainted by the Memo because it was protected speech under § 8(c). We reject this argument, having deferred to the Board's conclusion that the Memo violated § 8(a)(1). Sheridan further argues that, even if the Memo was not protected speech, the record lacks substantial evidence that the Memo was the cause of the Union's loss of support. It notes that the Union provided its own memorandum to all bargaining unit members conveying the exact same information as the Memo, at virtually the same time. Thus, according to Sheridan it is at least equally probable that the Union memorandum, rather than the Memo, caused the employees' discontent.
 
 
 30
 We disagree. "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Local One, Amalgamated Lithographers of America v. NLRB, 729 F.2d 172, 175 (2d Cir. 1984) (internal quotation marks omitted). The Board considers several factors in determining whether a causal relationship exists between an unfair labor practice and a union's loss of support, including: (1) the length of time between the unfair labor practice and the withdrawal of recognition; (2) the nature of the violation, including the possibility of a detrimental or lasting effect on employees; (3) the tendency of the violation to cause employee disaffection; and (4) the effect of the unlawful conduct on employees' morale, organizational activities, and membership in the union. See Master Slack Corp., 271 NLRB 78, 84 (1984). The record contains substantial evidence that the Memo was the cause of employee dissatisfaction with the Union. As noted by the NLRB panel:
 
 
 31
 The petition materialized in a matter of days following the unfair labor practice; the subject of [Sheridan's] unlawful memorandum . . . was the motivating force behind the petition; and the unfair labor practice had an effect on employees' union membership and support and had a tendency to cause employee disaffection.
 
 
 32
 Sheridan Manor, 1999 WL 812241, at *4. Because the petition was tainted by Sheridan's unfair labor practice, we affirm the Board's conclusion that Sheridan could not rely on the petition as a valid indicator of employee sentiment and violated §§ 8(a)(5) and (1) by withdrawing recognition of the Union on that basis. See Davies Med. Ctr., 303 NLRB 195, 207-08 (1991), enforced 991 F.2d 803 (9th Cir. 1993) (memorandum); Texaco, Inc., 264 NLRB 1132, 1132-33 (1982), enforced 722 F.2d 1226 (5th Cir. 1984).
 
 CONCLUSION
 
 33
 We have considered all of Sheridan's remaining arguments and find them to be without merit. The judgment of the NLRB is affirmed.
 
 
 
 Notes:
 
 
 *
 The Honorable J. Garvan Murtha, Chief Judge of the United District Court for the District of Vermont, sitting by designation.
 
 
 [1]
 A union "enjoys a conclusive presumption of majority support" for one year after certification. Bryant & Stratton Business Inst., Inc. v. NLRB, 140 F.3d 169, 186 (2d Cir. 1998). Absent special circumstances, a union's majority status cannot be challenged during this periond. See id. "This presumption . . . removes any temptation on the employer's part to avoid good-faith bargaining in an effort to undermine union support." Id.